# WALTERS, ADMINISTRATOR OF VETERANS' AFFAIRS, ET AL. *v.* NATIONAL ASSOCIATION OF RADIATION SURVIVORS ET AL.

No. 84–571.   Argued March 27, 1985—Decided June 28, 1985

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, in which BLACKMUN, J., joined, *post*, p. 336. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 338. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 358.

*Mark I. Levy* argued the cause for appellants. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller,* and *William Kanter.*

*Gordon P. Erspamer* argued the cause and filed a brief for appellees National Association of Radiation Survivors et al. *Robert L. Gnaizda* filed a brief for appellee American G. I. Forum.*

---

*\*Joseph C. Zengerle* filed a brief for Disabled American Veterans as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation et al. by *Burt Neuborne, Charles S.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Title 38 U. S. C. § 3404(c) limits to $10 the fee that may be paid an attorney or agent who represents a veteran seeking benefits for service-connected death or disability. The United States District Court for the Northern District of California held that this limit violates the Due Process Clause of the Fifth Amendment, and the First Amendment, because it denies veterans or their survivors the opportunity to retain counsel of their choice in pursuing their claims. We noted probable jurisdiction of the Government's appeal, 469 U. S. 1085 (1984), and we now reverse.

I

Congress has by statute established an administrative system for granting service-connected death or disability benefits to veterans. See 38 U. S. C. § 301 *et seq.* The amount of the benefit award is not based upon need, but upon service connection—that is, whether the disability is causally related to an injury sustained in the service—and the degree of incapacity caused by the disability. A detailed system has been established by statute and Veterans' Administration (VA) regulation for determining a veteran's entitlement, with final authority resting with an administrative body known as the Board of Veterans' Appeals (BVA). Judicial review of VA decisions is precluded by statute. 38 U. S. C. § 211(a); *Johnson* v. *Robison*, 415 U. S. 361 (1974). The controversy in this case centers on the opportunity for a benefit applicant

*Sims, Alan L. Schlosser,* and *Amitai Schwartz;* for the American Veterans Committee, Inc., by *Michael W. Beasley, Allan L. Kamerow, Lawrence E. Lewy,* and *Irving R. M. Panzer;* for the Federal Bar Association by *Alfred F. Belcuore;* for the Lawyers' Club of San Francisco by *Jerome Sapiro, Jr.,* and *Fred H. Altshuler;* for the National Association of Atomic Veterans by *Walter R. Allan, Karen J. Wegner,* and *Debra B. Keil;* for Vietnam Veterans of America by *Mary E. Baluss, Samuel M. Sipe, Jr., David F. Addlestone,* and *Barton F. Stichman;* and for Andrew Groza by *James Joseph Lynch, Jr.*

or recipient to obtain legal counsel to aid in the presentation of his claim to the VA. Section 3404(c) of Title 38 provides:

> "The Administrator shall determine and pay fees to agents or attorneys recognized under this section in allowed claims for monetary benefits under laws administered by the Veterans' Administration. Such fees—
>
> .           .           .           .           .
>
> "(2) shall not exceed $10 with respect to any one claim . . . ."

Section 3405 provides criminal penalties for any person who charges fees in excess of the limitation of § 3404.

Appellees here are two veterans' organizations, three individual veterans, and a veteran's widow.[1] The two veterans' organizations are the National Association of Radiation Survivors, an organization principally concerned with obtaining compensation for its members for injuries resulting from atomic bomb tests, and Swords to Plowshares Veterans Rights Organization, an organization particularly devoted to the concerns of Vietnam veterans. The complaint contains no further allegation with respect to the numbers of members in either organization who are veteran claimants. Appellees did not seek class certification.

Appellees contended in the District Court that the fee limitation provision of § 3404 denied them any realistic opportunity to obtain legal representation in presenting their claims to the VA and hence violated their rights under the Due Process Clause of the Fifth Amendment and under the First Amendment. The District Court agreed with the appellees on both of these grounds, and entered a nationwide "preliminary injunction" barring appellants from enforcing the fee limitation. 589 F. Supp. 1302 (1984). To understand fully the posture in which the case reaches us it is necessary to discuss the administrative scheme in some detail.

---

[1] A fourth individual veteran plaintiff died during the pendency of the proceedings.

Congress began providing veterans pensions in early 1789, and after every conflict in which the Nation has been involved Congress has, in the words of Abraham Lincoln, "provided for him who has borne the battle, and his widow and his orphan." The VA was created by Congress in 1930, and since that time has been responsible for administering the congressional program for veterans' benefits. In 1978, the year covered by the report of the Legal Services Corporation to Congress that was introduced into evidence in the District Court, approximately 800,000 claims for service-connected disability or death and pensions were decided by the 58 regional offices of the VA. Slightly more than half of these were claims for service-connected disability or death, and the remainder were pension claims. Of the 800,000 total claims in 1978, more than 400,000 were allowed, and some 379,000 were denied. Sixty-six thousand of these denials were contested at the regional level; about a quarter of these contests were dropped, 15% prevailed on reconsideration at the local level, and the remaining 36,000 were appealed to the BVA. At that level some 4,500, or 12%, prevailed, and another 13% won a remand for further proceedings. Although these figures are from 1978, the statistics in evidence indicate that the figures remain fairly constant from year to year.

As might be expected in a system which processes such a large number of claims each year, the process prescribed by Congress for obtaining disability benefits does not contemplate the adversary mode of dispute resolution utilized by courts in this country. It is commenced by the submission of a claim form to the local veterans agency, which form is provided by the VA either upon request or upon receipt of notice of the death of a veteran. Upon application a claim generally is first reviewed by a three-person "rating board" of the VA regional office—consisting of a medical specialist, a legal specialist, and an "occupational specialist." A claimant is "entitled to a hearing at any time on any issue involved in a claim . . . ." 38 CFR § 3.103(c) (1984). Proceedings in front of the rating board "are ex parte in nature," § 3.103(a); no

Government official appears in opposition. The principal issues are the extent of the claimant's disability and whether it is service connected. The board is required by regulation "to assist a claimant in developing the facts pertinent to his claim," § 3.103(a), and to consider any evidence offered by the claimant. See § 3.103(b). In deciding the claim the board generally will request the applicant's Armed Service and medical records, and will order a medical examination by a VA hospital. Moreover, the board is directed by regulation to resolve all reasonable doubts in favor of the claimant. § 3.102.[2]

After reviewing the evidence the board renders a decision either denying the claim or assigning a disability "rating" pursuant to detailed regulations developed for assessing various disabilities. Money benefits are calculated based on the rating. The claimant is notified of the board's decision and its reasons, and the claimant may then initiate an appeal by

---

[2] Title 38 CFR § 3.102 (1984) states:

"It is the defined and consistently applied policy of the Veterans Administration to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. By reasonable doubt is meant one which exists by reason of the fact that the evidence does not satisfactorily prove or disprove the claim, yet a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence; the claimant is required to submit evidence sufficient to justify a belief in a fair and impartial mind that his claim is well grounded. Mere suspicion or doubt as to the truth of any statements submitted, as distinguished from impeachment or contradiction by evidence or known facts, is not a justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete record otherwise warrants involving this doctrine. The reasonable doubt doctrine is also applicable even in the absence of official records, particularly if the basic incident allegedly arose under combat, or similarly strenuous conditions, and is consistent with the probable results of such known hardships."

filing a "notice of disagreement" with the local agency. If the local agency adheres to its original decision it must then provide the claimant with a "statement of the case"—a written description of the facts and applicable law upon which the board based its determination—so that the claimant may adequately present his appeal to the BVA. Hearings in front of the BVA are subject to the same rules as local agency hearings—they are *ex parte*, there is no formal questioning or cross-examination, and no formal rules of evidence apply. 38 CFR § 19.157 (1984). The BVA's decision is not subject to judicial review. 38 U. S. C. § 211(a).[3]

The process is designed to function throughout with a high degree of informality and solicitude for the claimant. There is no statute of limitations, and a denial of benefits has no formal res judicata effect; a claimant may resubmit as long as he presents new facts not previously forwarded. See 38 CFR §§ 3.104, 3.105 (1984). Although there are time limits for submitting a notice of disagreement and although a claimant may prejudice his opportunity to challenge factual or legal decisions by failing to challenge them in that notice, the time limit is quite liberal—up to one year—and the VA boards are instructed to read any submission in the light most favorable to the claimant. See 38 CFR §§ 19.129, 19.124, 19.121 (1984). Perhaps more importantly for present purposes, however, various veterans' organizations across the country make available trained service agents, free of charge, to assist claimants in developing and presenting their claims. These service representatives are contemplated by the VA statute, 38 U. S. C. § 3402, and they are recognized as an important part of the administrative scheme. Appellees' counsel agreed at argument that a representative is available for

---

[3] Despite the general preclusion of judicial review with respect to VA benefits claims, this Court held in *Johnson* v. *Robison*, 415 U. S. 361 (1974), that the district courts have jurisdiction to entertain constitutional attacks on the operation of the claims systems.

any claimant who requests one, regardless of the claimant's affiliation with any particular veterans' group.[4]

In support of their claim that the present statutory and administrative scheme violates the Constitution, appellees submitted affidavits and declarations of 16 rejected claimants or recipients and 24 practicing attorneys, depositions of several VA employees, and various exhibits. The District Court held a hearing and then issued a 52-page opinion and order granting the requested "preliminary injunction."[5]

With respect to the merits of appellees' due process claim, the District Court first determined that recipients of service-connected death and disability benefits possess "property" interests protected by the Due Process Clause, see *Mathews v. Eldridge*, 424 U. S. 319 (1976) (recipients of Social Security benefits possess a protected "property" interest), and also held that *applicants* for such benefits possess such an interest. Although noting that this Court has never ruled on the latter question, the court relied on several opinions of the Court of Appeals for the Ninth Circuit holding, with respect to similar Government benefits, that applicants possess such an interest. See, *e. g., Ressler* v. *Pierce*, 692 F. 2d 1212, 1214–1216 (1982) (applicants for federal rent subsidies).

The court then held that appellees had a strong likelihood of showing that the administrative scheme violated the due process rights of those entitled to benefits. In holding that the process described above was "fundamentally unfair," the court relied on the analysis developed by this Court in

---

[4] The VA statistics show that 86% of all claimants are represented by service representatives, 12% proceed *pro se*, and 2% are represented by lawyers. App. 190. Counsel agreed at argument that the 12% who proceed *pro se* do so by their own choice.

[5] The District Court rejected appellants' argument that the question presented was controlled by this Court's summary affirmance in *Gendron* v. *Saxbe*, 389 F Supp. 1303 (DC Cal.), summarily aff'd *sub nom. Gendron* v. *Levi*, 423 U. S. 802 (1975). Because we noted probable jurisdiction and heard oral argument in order to decide this case on the merits there is no need for us to determine whether the District Court properly distinguished *Gendron*.

*Mathews* v. *Eldridge, supra,* in which we stated the factors that must be weighed in determining what process is due an individual subject to a deprivation:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U. S., at 335.

In applying this test the District Court relied heavily on appellees' evidence; it noted that the veterans' interest in receiving benefits was significant in that many recipients are disabled, and totally or primarily dependent on benefits for their support.  589 F. Supp., at 1315.  With respect to the likelihood of error under the present system, and the value of the additional safeguard of legal representation, it first noted that some of the appellees had been represented by service agents and had been dissatisfied with their representation, and had sought and failed to obtain legal counsel due solely to the fee limitation.  The court found that absent expert legal counsel claimants ran a significant risk of forfeiting their rights, because of the highly complex issues involved in some cases.  VA processes, the court reasoned, allow claimants to waive points of disagreement on appeal, or to waive appeal altogether by failing to file the notice of disagreement; in addition, claimants simply are not equipped to engage in the factual or legal development necessary in some cases, or to spot errors made by the administrative boards.  *Id.,* at 1319–1321.

With respect to whether the present process alleviated these problems, the court found that "neither the VA officials themselves nor the service organizations are providing the full array of services that paid attorneys might make avail-

able to claimants." *Id.*, at 1320. Even assuming that all VA personnel were willing to go out of their way for each claimant, a point which the court would not fully accept,[6] the court found that in any event the VA does not have the resources to permit the substantial investments of time that are necessary. The VA does not seek independent testimony that might establish service connection, or independent medical examinations with respect to disability.

In reaching its conclusions the court relied heavily on the problems presented by what it described as "complex cases"—a class of cases also focused on in the depositions. Though never expressly defined by the District Court, these cases apparently include those in which a disability is slow developing and therefore difficult to find service connected, such as the claims associated with exposure to radiation or harmful chemicals, as well as other cases identified by the deponents as involving difficult matters of medical judgment. Nowhere in the opinion of the District Court is there any estimate of what percentage of the annual VA caseload of 800,000 these cases comprise, nor is there any more precise description of the class. There is no question but what the 3 named plaintiffs and the plaintiff veteran's widow asserted such claims, and in addition there are declarations in the record from 12 other claimants who were asserting such claims. The evidence contained in the record, however, suggests that the sum total of such claims is extremely small; in 1982, for example, roughly 2% of the BVA caseload consisted of "agent orange" or "radiation" claims, and what evidence

---

[6] The District Court in its opinion questioned "the extent to which it is possible to serve the interests of both the VA and claimants simultaneously," and suggested that there was a "conflict" and that "the VA personnel might feel some pressure to protect the government purse." 589 F. Supp., at 1320, n. 17. There is no indication of such bias in the record— quite the contrary. Nor are we willing to accept that administrative adjudicators are presumptively subject to such bias.

there is suggests that the percentage of such claims in the regional offices was even less—perhaps as little as 3 in 1,000.

With respect to the service representatives, the court again found the representation unsatisfactory. Although admitting that this was not due to any "lack of dedication," the court found that a heavy caseload and the lack of legal training combined to prevent service representatives from adequately researching a claim. Facts are not developed, and "it is standard practice for service organization representatives to submit merely a one to two page handwritten brief." *Id.*, at 1322.

Based on the inability of the VA and service organizations to provide the full range of services that a retained attorney might, the court concluded that appellees had demonstrated a "high risk of erroneous deprivation" from the process as administered. *Ibid.* The court then found that the Government had "failed to demonstrate that it would suffer any harm if the statutory fee limitation . . . were lifted." *Id.*, at 1323. The only Government interest suggested was the "paternalistic" assertion that the fee limitation is necessary to ensure that claimants do not turn substantial portions of their benefits over to unscrupulous lawyers. The court suggested that there were "less drastic means" to confront this problem.

Finally, the court agreed with appellees that there was a substantial likelihood that the fee limitation also violates the First Amendment. The court relied on this Court's decisions in *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217 (1967), and *Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar*, 377 U. S. 1 (1964), as establishing "the principle that the First Amendment rights to petition, association and speech protect efforts by organizations and individuals to obtain effective legal representation of their constituents or themselves." 589 F. Supp., at 1324. This right to "adequate legal representation" or "meaningful access to courts," the court found, was infringed by the fee limitation—again

without substantial justification by the Government. *Id.*, at 1325–1326.

After reiterating the Government's failure of proof with respect to the likely harms arising from doing away with the fee limitation, the court entered a "preliminary injunction" enjoining the Government appellants from "enforcing or attempting to enforce in any way the provisions of 38 U. S. C. §§ 3404–3405 . . . ." *Id.*, at 1329. The injunction was not limited to the particular plaintiffs, nor was it limited to claims processed in the District of Northern California, where the court sits.

## II

Before proceeding to the merits we must deal with a significant question as to our jurisdiction, one not raised by appellees in this Court. This appeal was taken under 28 U. S. C. § 1252, which grants this Court jurisdiction "from an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action . . . to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party." We have here an interlocutory decree in a civil action to which an officer of the United States is a party, and the only question is whether the District Court's decision "holds" an Act of Congress unconstitutional. The problem, of course, is that given that the court's opinion and order are cast in terms of a "preliminary injunction" the court only states that there is a "high likelihood of success" on the merits of appellees' claims, and does not specifically state that the fee limitation provision is unconstitutional.

We do not write on a clean slate. In *McLucas* v. *DeChamplain*, 421 U. S. 21 (1975), this Court similarly entertained an appeal from an order that granted a preliminary injunction and in the process held an Act of Congress unconstitutional. In holding that we had jurisdiction under § 1252 we noted that that section constitutes an "exception" to "the

policy . . . of minimizing the mandatory docket of this Court," and we went on to state:

> "It might be argued that, in deciding to issue the preliminary injunction, the District Court made only an interlocutory determination of appellee's probability of success on the merits and did not finally 'hold' the article unconstitutional. By its terms, however, § 1252 applies to interlocutory as well as final judgments, decrees, and orders, and this Court previously has found the section properly invoked when the court below has made only an interlocutory determination of unconstitutionality, at least if, as here, that determination forms the necessary predicate to the grant or denial of preliminary equitable relief." *Id.*, at 30.

We think this case is controlled by *McLucas*. It is true that in *McLucas* the District Court actually stated its holding that the statute was unconstitutional, whereas here the court's statements are less direct. But that is merely a semantic difference in this case; inasmuch as any conclusions reached at the preliminary injunction stage are subject to revision, *University of Texas* v. *Camenisch*, 451 U. S. 390, 395 (1981), it should make little difference whether the court stated conclusively that a statute was unconstitutional, or merely said it was likely, so long as the injunction granted enjoined the statute's operation. This Court's appellate jurisdiction does not turn on such semantic niceties. See also *California* v. *Grace Brethren Church*, 457 U. S. 393, 405 (1982) ("§ 1252 provides jurisdiction even though the lower court did not expressly declare a federal statute unconstitutional . . .").

Indeed, we note that the problem raised by the statute's use of the word "holding" may in any event be a bit of a red herring. In its original form § 1252 provided this Court with appellate jurisdiction over decisions "against the constitutionality of any Act of Congress," see Act of Aug. 24, 1937,

ch. 754, § 2, 50 Stat. 752;[7] although this language was changed when the provision was codified in 1948, so that § 1252 now grants jurisdiction from a decision *"holding* any Act of Congress unconstitutional," this change was effected without substantive comment, and absent such comment it is generally held that a change during codification is not intended to alter the statute's scope. See *Muniz* v. *Hoffman,* 422 U. S. 454, 467–474 (1975). Any fair reading of the decision at issue would conclude that it is "against the constitutionality" of § 3404, and we are loath to read an unheralded change in phraseology to divest us of jurisdiction here.

Finally, acceptance of appellate jurisdiction in this case is in accord with the purpose of the statutory grant. Last Term, in *Heckler* v. *Edwards,* 465 U. S. 870 (1984), we discussed § 1252's legislative history. We noted that in enacting § 1252 Congress sought to identify a category of important decisions adverse to the constitutionality of an Act of Congress — which decisions, because the United States or its agent was a party, had implications beyond the controversy then before the court — and to provide an expeditious means for ensuring certainty and uniformity in the enforcement of such an Act by establishing direct review over such decisions in this Court. *Id.,* at 879–883. *Edwards* teaches that the decisions Congress targeted for appeal under § 1252 were those which involved the exercise of judicial power to impair the enforcement of an Act of Congress on constitutional grounds, and that it was the constitutional question that Congress wished this Court to decide. As we pointed out in *McLucas,*

---

[7] Act of Aug. 24, 1937, ch. 754, § 2, 50 Stat. 752, provided:

"In any suit or proceeding in any court of the United States to which the United States, or any agency thereof, or any officer or employee thereof, as such officer or employee, is a party, or in which the United States has intervened and become a party, and in which the decision is against the constitutionality of any Act of Congress, an appeal may be taken directly to the Supreme Court of the United States by the United States or any other party. . . ."

§ 1252 contemplates that this impairment can arise from interlocutory decrees, just as the original statute provided for appeal from decisions in "any proceedings." Cf. *Goldstein* v. *Cox*, 396 U. S. 471, 476 (1970) (28 U. S. C. § 1253 authorizes direct appeals from preliminary injunctions issued by three-judge courts). A single district judge's interlocutory decision on constitutional grounds that an Act of Congress should not be enforced frustrates the will of Congress in the short run just as surely as a final decision to that effect. By § 1252 Congress gave the Government the right of immediate appeal to this Court in such a situation so that only those district court injunctions which had been reviewed and upheld by this Court would continue to have such an effect. Cf. *Edwards, supra.* The injunction at issue here creates precisely the problem to which § 1252 was addressed, inasmuch as it enjoins the operation of the fee limitation on constitutional grounds, across the country and under all circumstances. Thus, whether or not the injunction here is framed as a "holding" of unconstitutionality we believe we have jurisdiction under § 1252.

## III

Judging the constitutionality of an Act of Congress is properly considered " 'the gravest and most delicate duty that this Court is called upon to perform,' " *Rostker* v. *Goldberg*, 453 U. S. 57, 64 (1981) (quoting *Blodgett* v. *Holden*, 275 U. S. 142, 148 (1927) (Holmes, J.)), and we begin our analysis here with no less deference than we customarily must pay to the duly enacted and carefully considered decision of a coequal and representative branch of our Government. Indeed one might think, if anything, that more deference is called for here; the statute in question for all relevant purposes has been on the books for over 120 years. Cf. *McCulloch* v. *Maryland*, 4 Wheat. 316, 401–402 (1819). This deference to congressional judgment must be afforded even though the

claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment. *Schweiker* v. *McClure*, 456 U. S. 188 (1982); *Mathews* v. *Eldridge*, 424 U. S., at 349. We think that the District Court went seriously awry in assessing the constitutionality of § 3404.

Appellees' first claim, accepted by the District Court, is that the statutory fee limitation, as it bears on the administrative scheme in operation, deprives a rejected claimant or recipient of "life, liberty or property, without due process of law," U. S. Const., Amdt. 5, by depriving him of representation by expert legal counsel.[8] Our decisions establish that "due process" is a flexible concept—that the processes required by the Clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur. See *Mathews, supra,* at 334; *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). In defining the process necessary to ensure "fundamental fairness" we have recognized that the Clause does not require that "the procedures used to guard against an erroneous deprivation . . . be so comprehensive as to preclude any possibility of error," *Mackey* v. *Montrym,* 443 U. S. 1, 13 (1979), and in addition we have emphasized that the marginal gains from affording an additional procedural safeguard often may be

---

[8] The District Court held that applicants for benefits, no less than persons already receiving them, had a "legitimate claim of entitlement" to benefits if they met the statutory qualifications. The court noted that this Court has never so held, although this Court has held that a person receiving such benefits has a "property" interest in their continued receipt. See *Atkins* v. *Parker,* 472 U. S. 115, 128 (1985); *Mathews* v. *Eldridge,* 424 U. S. 319 (1976). Since at least one of the claimants here alleged a diminution of benefits already being received, however, we must in any event decide whether "due process" under the circumstances includes the right to be represented by employed counsel. In light of our decision on that question, *infra,* at 334, we need not presently define what class would be entitled to the process requested.

outweighed by the societal cost of providing such a safe-guard. See *Mathews*, 424 U. S., at 348.[9]

These general principles are reflected in the test set out in *Mathews*, which test the District Court purported to follow, and which requires a court to consider the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, the probable value of additional or substitute procedural safeguards, and the government's interest in adhering to the existing system. *Id.*, at 335. In applying this test we must keep in mind, in addition to the deference owed to Congress, the fact that the very nature of the due process inquiry indicates that the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case; rather, "procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Id.*, at 344; see also *Parham* v. *J. R.*, 442 U. S. 584, 612–613 (1979).

The Government interest, which has been articulated in congressional debates since the fee limitation was first enacted in 1862 during the Civil War, has been this: that the system for administering benefits should be managed in a sufficiently informal way that there should be no need for the employment of an attorney to obtain benefits to which a claimant was entitled, so that the claimant would receive the entirety of the award without having to divide it with a lawyer. See *United States* v. *Hall*, 98 U. S. 343, 352–355 (1879). This purpose is reinforced by a similar absolute prohibition on compensation of any service organization repre-

---

[9] See Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1276 (1975):

"It should be realized that procedural requirements entail the expenditure of limited resources, that at some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection, and that the expense of protecting those likely to be found undeserving will probably come out of the pockets of the deserving."

sentative. 38 U. S. C. 3402(b)(1). While Congress has recently considered proposals to modify the fee limitation in some respects, a Senate Committee Report in 1982 highlighted that body's concern that "any changes relating to attorneys' fees be made carefully so as not to induce unnecessary retention of attorneys by VA claimants and not to disrupt unnecessarily the very effective network of nonattorney resources that has evolved in the absence of significant attorney involvement in VA claims matters." S. Rep. No. 97–466, p. 49 (1982). Although this same Report professed the Senate's belief that the original stated interest in protecting veterans from unscrupulous lawyers was "no longer tenable," the Senate nevertheless concluded that the fee limitation should with a limited exception remain in effect, in order to "protect claimants' benefits" from being unnecessarily diverted to lawyers.[10]

In the face of this congressional commitment to the fee limitation for more than a century, the District Court had only this to say with respect to the governmental interest:

"The government has neither argued nor shown that lifting the fee limit would harm the government in any way,

---

[10] JUSTICE STEVENS' dissent quotes liberally from this same Senate Committee Report, *post*, at 365–366, apparently intending to suggest that the Committee determined that the fee limitation was no longer justified. The quote is taken out of context, and as such it is quite misleading. The bill with respect to which the Report was issued would have provided for the first time for limited judicial review of BVA decisions. To this end, the Committee determined that "some easing of the limitation on attorneys' fees" would be necessary to allow a claimant to pursue an effective appeal in the federal courts. *But the proposed bill retained the fee limitation for all VA proceedings up to and including the first denial of a claim by the BVA.* In the sections of the Report not quoted by JUSTICE STEVENS the Committee explained that the limitation was retained to "protect claimant's benefits," and because until judicial review was contemplated there was "no need" for attorneys. S. Rep. No. 97–466, p. 50 (1982). Finally, it is worth noting that in any event the proposed bill died in House Committee and thus was never enacted.

except as the paternalistic protector of claimants' supposed best interests. To the extent the paternalistic role is valid, there are less drastic means available to ensure that attorneys' fees do not deplete veterans' death or disability benefits." 589 F. Supp., at 1323.

It is not for the District Court or any other federal court to invalidate a federal statute by so cavalierly dismissing a long-asserted congressional purpose. If "paternalism" is an insignificant Government interest, then Congress first went astray in 1792, when by its Act of March 23 of that year it prohibited the "sale, transfer or mortgage . . . of the pension . . . [of a] soldier . . . before the same shall become due." Ch. 11, § 6, 1 Stat. 245. Acts of Congress long on the books, such as the Fair Labor Standards Act, might similarly be described as "paternalistic"; indeed, this Court once opined that "[s]tatutes of the nature of that under review, limiting the hours in which grown and intelligent men may labor to earn their living, are mere meddlesome interferences with the rights of the individual . . . ." *Lochner* v. *New York*, 198 U. S. 45, 61 (1905). That day is fortunately long gone, and with it the condemnation of rational paternalism as a legitimate legislative goal.

There can be little doubt that invalidation of the fee limitation would seriously frustrate the oft-repeated congressional purpose for enacting it. Attorneys would be freely employable by claimants to veterans' benefits, and the claimant would as a result end up paying part of the award, or its equivalent, to an attorney. But this would not be the only consequence of striking down the fee limitation that would be deleterious to the congressional plan.

A necessary concomitant of Congress' desire that a veteran not need a representative to assist him in making his claim was that the system should be as informal and nonadversarial as possible. This is not to say that complicated factual inquiries may be rendered simple by the expedient of informality, but surely Congress desired that the proceedings be as

informal and nonadversarial as possible.[11]  The regular introduction of lawyers into the proceedings would be quite unlikely to further this goal.  Describing the prospective impact of lawyers in probation revocation proceedings, we said in *Gagnon* v. *Scarpelli,* 411 U. S. 778, 787–788 (1973):

> "The introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding.  If counsel is provided for the probationer or parolee, the State in turn will normally provide its own counsel; lawyers, by training and disposition, are advocates and bound by professional duty to present all available evidence and arguments in support of their clients' positions and to contest with vigor all adverse evidence and views. The role of the hearing body itself . . . may become more akin to that of a judge at a trial, and less attuned to the rehabilitative needs of the individual . . . .  Certainly,

[11] The District Court stated in its opinion that "both claimants and attorneys familiar with the VA system view that system as adversarial. . . ." 589 F. Supp., at 1321.  In reaching this conclusion, the District Court referred to statements by two attorneys and two claimants.  One of the attorneys was admitted to practice in California in 1978, but does not take claims before the VA because of the fee limitation.  His familiarity with VA procedures was acquired as a certified representative before the VA for appellee Swords to Ploughshares during his time as a law student. The second attorney was admitted to practice in Wisconsin in 1981, and has been a staff member of appellee Swords to Ploughshares since 1980.  His representation of veterans has been primarily before discharge boards, but in the course of this representation he has become familiar with VA rules and practices.  Both stated that they regarded the VA procedures as "adversarial."  Two claimants testified on the basis of their own experience, one that the VA had been "very adversarial" and the other that "the VA has opposed me at every turn. . . ."

Anecdotal evidence such as this may well be sufficient to support a finding by a judge or jury in litigation between private parties that a particular fact did or did not exist.  But when we deal with a massive benefits program provided by Congress in which 800,000 claims per year are decided by 58 regional offices, and 36,000 claims are appealed to the BVA, it is simply not the sort of evidence that will permit a conclusion that the entire system is operated contrary to its governing regulations.

the decisionmaking process will be prolonged, and the financial cost to the State—for appointed counsel, . . . a longer record, and the possibility of judicial review—will not be insubstantial."

We similarly noted in *Wolff* v. *McDonnell*, 418 U. S. 539, 570 (1974), that the use of counsel in prison disciplinary proceedings would "inevitably give the proceedings a more adversary cast . . . ."

Knowledgeable and thoughtful observers have made the same point in other language:

> "To be sure, counsel can often perform useful functions even in welfare cases or other instances of mass justice; they may bring out facts ignored by or unknown to the authorities, or help to work out satisfactory compromises. But this is only one side of the coin. Under our adversary system the role of counsel is not to make sure the truth is ascertained but to advance his client's cause by any ethical means. Within the limits of professional propriety, causing delay and sowing confusion not only are his right but may be his duty. The appearance of counsel for the citizen is likely to lead the government to provide one—or at least to cause the government's representative to act like one. The result may be to turn what might have been a short conference leading to an amicable result into a protracted controversy.

> . . . . .

> "These problems concerning counsel and confrontation inevitably bring up the question whether we would not do better to abandon the adversary system in certain areas of mass justice. . . . While such an experiment would be a sharp break with our tradition of adversary process, that tradition, which has come under serious general challenge from a thoughtful and distinguished judge, was not formulated for a situation in which many thousands of hearings must be provided each month."

Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1287–1290 (1975).

Thus, even apart from the frustration of Congress' principal goal of wanting the veteran to get the entirety of the award, the destruction of the fee limitation would bid fair to complicate a proceeding which Congress wished to keep as simple as possible. It is scarcely open to doubt that if claimants were permitted to retain compensated attorneys the day might come when it could be said that an attorney might indeed be necessary to present a claim properly in a system rendered more adversary and more complex by the very presence of lawyer representation. It is only a small step beyond that to the situation in which the claimant who has a factually simple and obviously deserving claim may nonetheless feel impelled to retain an attorney simply because so many other claimants retain attorneys. And this additional complexity will undoubtedly engender greater administrative costs, with the end result being that less Government money reaches its intended beneficiaries.

We accordingly conclude that under the *Mathews* v. *Eldridge* analysis great weight must be accorded to the Government interest at stake here. The flexibility of our approach in due process cases is intended in part to allow room for other forms of dispute resolution; with respect to the individual interests at stake here, legislatures are to be allowed considerable leeway to formulate such processes without being forced to conform to a rigid constitutional code of procedural necessities. See *Parham* v. *J. R.*, 442 U. S., at 608, n. 16. It would take an extraordinarily strong showing of probability of error under the present system—and the probability that the presence of attorneys would sharply diminish that possibility—to warrant a holding that the fee limitation denies claimants due process of law. We have no hesitation in deciding that no such showing was made out on the record before the District Court.

As indicated by the statistics set out earlier in this opinion, more than half of the 800,000 claims processed annually by the VA result in benefit awards at the regional level. An additional 10,000 claims succeed on request for reconsideration at the regional level, and of those that do not, 36,000 are appealed to the BVA. Of these, approximately 16% succeed before the BVA. It is simply not possible to determine on this record whether any of the claims of the named plaintiffs, or of other declarants who are not parties to the action, were wrongfully rejected at the regional level or by the BVA, nor is it possible to quantify the "erroneous deprivations" among the general class of rejected claimants. If one regards the decision of the BVA as the "correct" result in every case, it follows that the regional determination against the claimant is "wrong" in the 16% of the cases that are reversed by the Board.

Passing the problems with quantifying the likelihood of an erroneous deprivation, however, under *Mathews* we must also ask what value the proposed additional procedure may have in reducing such error. In this case we are fortunate to have statistics that bear directly on this question, which statistics were addressed by the District Court. These unchallenged statistics chronicle the success rates before the BVA depending on the type of representation of the claimant, and are summarized in the following figures taken from the record. App. 568.

ULTIMATE SUCCESS RATES BEFORE THE BOARD OF VETERANS' APPEALS BY MODE OF REPRESENTATION

American Legion ....................................... 16.2%
American Red Cross ................................... 16.8%
Disabled American Veterans ......................... 16.6%
Veterans of Foreign Wars ............................ 16.7%
Other nonattorney ..................................... 15.8%
`No representation ..................................... 15.2%
Attorney/Agent ......................................... 18.3%

The District Court opined that these statistics were not helpful, because in its view lawyers were retained so infrequently that no body of lawyers with an expertise in VA practice had developed, and lawyers who represented veterans regularly might do better than lawyers who represented them only *pro bono* on a sporadic basis. The District Court felt that a more reliable index of the effect lawyers would have on the proceedings was a statistical study showing success of various representatives in appeals to discharge review boards in the uniformed services—statistics that showed a significantly higher success rate for those claimants represented by lawyers as compared to those claimants not so represented.

We think the District Court's analysis of this issue totally unconvincing, and quite lacking in the deference which ought to be shown by any federal court in evaluating the constitutionality of an Act of Congress. We have the most serious doubt whether a competent lawyer taking a veteran's case on a *pro bono* basis would give less than his best effort, and we see no reason why experience in developing facts as to causation in the numerous other areas of the law where it is relevant would not be readily transferable to proceedings before the VA. Nor do we think that lawyers' success rates in proceedings before military boards to upgrade discharges — proceedings which are not even conducted before the VA, but before military boards of the uniformed services—are to be preferred to the BVA statistics which show reliable success by mode of representation in the very type of proceeding to which the litigation is devoted.

The District Court also concluded, apparently independently of its ill-founded analysis of the claim statistics, (1) that the VA processes are procedurally, factually, and legally complex, and (2) that the VA system presently does not work as designed, particularly in terms of the representation afforded by VA personnel and service representatives, and that these representatives are "unable to perform all of the services which might be performed by a claimant's own

paid attorney." 589 F. Supp., at 1322. Unfortunately the court's findings on "complexity" are based almost entirely on a description of the plan for administering benefits in the abstract, together with references to "complex" cases involving exposure to radiation or agent orange, or post-traumatic stress syndrome. The court did not attempt to state even approximately how often procedural or substantive complexities arise in the run-of-the-mine case, or even in the unusual case. The VA procedures cited by the court do permit a claimant to prejudice his rights by failing to respond in a timely manner to an agency notice of denial of an initial claim, but despite this possibility there is nothing in the District Court's opinion indicating that these procedural requirements have led to an unintended forfeiture on the part of a diligent claimant. On the face of the procedures, the process described by the District Court does not seem burdensome: one year would in the judgment of most be ample time to allow a claimant to respond to notice requesting a response. In addition, the VA is required to read any submission in the light most favorable to the claimant, and service representatives are available to see that various procedural steps are complied with. It may be that the service representative cannot, as the District Court hypothesized, provide all the services that a lawyer could, but there is no evidence in the record that they cannot or do not provide advice about time limits.

The District Court's opinion is similarly short on definition or quantification of "complex" cases. If this term be understood to include all cases in which the claimant asserts injury from exposure to radiation or agent orange, only approximately 3 in 1,000 of the claims at the regional level and 2% of the appeals to the BVA involve such claims. Nor does it appear that all such claims would be complex by any fair definition of that term: at least 25% of all agent orange cases and 30% of the radiation cases, for example, are disposed of because the medical examination reveals no disability. What evidence does appear in the record indicates that the great

majority of claims involve simple questions of fact, or medical questions relating to the degree of a claimant's disability; the record also indicates that only the rare case turns on a question of law. There are undoubtedly "complex" cases pending before the VA, and they are undoubtedly a tiny fraction of the total cases pending. Neither the District Court's opinion nor any matter in the record to which our attention has been directed tells us more than this.

The District Court's treatment of the likely usefulness of attorneys is on the same plane with its efforts to quantify the likelihood of error under the present system. The court states several times in its opinion that lawyers could provide more services than claimants presently receive—a fact which may freely be conceded—but does not suggest how the availability of these services would reduce the likelihood of error in the run-of-the-mine case. Simple factual questions are capable of resolution in a nonadversarial context, and it is less than crystal clear why *lawyers* must be available to identify possible errors in *medical* judgment. Cf. *Parham* v. *J. R.*, 442 U. S., at 609–612. The availability of particular lawyers' services in so-called "complex" cases might be more of a factor in preventing error in such cases, but on this record we simply do not know how those cases should be defined or what percentage of all of the cases before the VA they make up. Even if the showing in the District Court had been much more favorable, appellees still would confront the constitutional hurdle posed by the principle enunciated in cases such as *Mathews* to the effect that a process must be judged by the generality of cases to which it applies, and therefore a process which is sufficient for the large majority of a group of claims is by constitutional definition sufficient for all of them. But here appellees have failed to make the very difficult factual showing necessary.[12]

---

[12] Our understanding of the operation of the claims process is further bolstered by the findings of the Senate Committee alluded to earlier. As noted *supra*, at 322, that Committee conducted an extensive inquiry into

Reliable evidence before the District Court showed that claimants represented by lawyers have a slightly better success rate before the BVA than do claimants represented by service representatives, and that both have a slightly better success rate than claimants who were not represented at all. Evidence also showed that there may be complex issues of causation in comparatively few of the hundreds of thousands of cases before the VA, but there is no adequate showing of the effect the availability of lawyers would have on the proper disposition of these cases. Neither the difference in success rate nor the existence of complexity in some cases is sufficient to warrant a conclusion that the right to retain and compensate an attorney in VA cases is a necessary element of procedural fairness under the Fifth Amendment.

the process in connection with several proposed bills that would have provided for judicial review of BVA decisions, and also would have withdrawn the fee limitation for proceedings occurring after the first denial by the BVA, while retaining the limitation for proceedings prior to that time. The Committee Report accompanying a 1982 bill noted its belief that the claims process presently operates informally and nonadversarially, that there was no evidence that most claimants were not satisfied with the VA's resolution of their claims, that there was in general "no need" for attorneys inasmuch as applying for benefits was a "relatively uncomplicated procedure," and that the service organizations afforded a "high quality of representation." S. Rep. No. 97–466, pp. 25, 49–50 (1982). Each bill unanimously passed the Senate, but died in House Committee, leaving the present system in operation. See S. 349, 97th Cong., 2d Sess (1982); S. 636, 98th Cong., 1st Sess. (1983).

When Congress makes findings on essentially factual issues such as these, those findings are of course entitled to a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue. See *Rostker* v. *Goldberg,* 453 U. S. 57, 72–73 (1981); *Vance* v. *Bradley,* 440 U. S. 93, 111–112 (1979); *Katzenbach* v. *McClung,* 379 U. S. 294 (1964). Because we do not believe the record in the District Court contradicted these findings, however, we need not rely on them, or determine what deference must be afforded on this congressional record; we mention the Committee's findings only because they are entirely consistent with our understanding of the record developed in the District Court.

We have in previous cases, of course, held not only that the Constitution permits retention of an attorney, but also that on occasion it requires the Government to provide the services of an attorney. The Sixth Amendment affords representation by counsel in all criminal proceedings, and in cases such as *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), and *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972), we have held that this provision requires a State prosecuting an indigent to afford him legal representation for his defense. No one would gainsay that criminal proceedings are adversarial in nature, and of course the Sixth Amendment applies only to such proceedings.

In cases such as *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), we observed that counsel can aid in identifying legal questions and presenting arguments, and that one charged with probation violation may have a right to counsel because of the liberty interest involved. We have also concluded after weighing the *Mathews* factors that the right to appointed counsel in a case involving the threatened termination of parental rights depends upon the circumstances of each particular case, see *Lassiter* v. *Department of Social Services of Durham County,* 452 U. S. 18 (1981), while three of the dissenters thought the same balancing required appointment of counsel in all such cases. *Id.,* at 35 (BLACKMUN, J., joined by BRENNAN and MARSHALL, JJ., dissenting).

But where, as here, the only interest protected by the Due Process Clause is a property interest in the continued receipt of Government benefits, which interest is conferred and terminated in a nonadversary proceeding, these precedents are of only tangential relevance. Appellees rely on *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), in which the Court held that a welfare recipient subject to possible termination of benefits was entitled to be represented by an attorney. The Court said that "counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the

recipient." *Id.*, at 270–271. But in defining the process required the Court also observed that "the crucial factor in this context . . . is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. . . . His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." *Id.*, at 264 (emphasis in original).

We think that the benefits at stake in VA proceedings, which are not granted on the basis of need, are more akin to the Social Security benefits involved in *Mathews* than they are to the welfare payments upon which the recipients in *Goldberg* depended for their daily subsistence. Just as this factor was dispositive in *Mathews* in the Court's determination that no evidentiary hearing was required prior to a temporary deprivation of benefits, 424 U. S., at 342–343, so we think it is here determinative of the right to employ counsel. Indeed, there appears to have been no stated policy on the part of New York in *Goldberg* against permitting an applicant to divide up his welfare check with an attorney who had represented him in the proceeding; the procedures there simply prohibited personal appearance of the recipient with or without counsel and regardless of whether counsel was compensated, and in reaching its conclusion the Court relied on agency regulations allowing recipients to be represented by counsel under some circumstances. 424 U. S., at 342–343.

This case is further distinguishable from our prior decisions because the process here is not designed to operate adversarially. While counsel may well be needed to respond to opposing counsel or other forms of adversary in a trial-type proceeding, where as here no such adversary appears, and in addition a claimant or recipient is provided with substitute safeguards such as a competent representative, a decision-maker whose duty it is to aid the claimant, and significant concessions with respect to the claimant's burden of proof,

the need for counsel is considerably diminished. We have expressed similar concerns in other cases holding that counsel is not required in various proceedings that do not approximate trials, but instead are more informal and nonadversary. See *Parham* v. *J. R.*, 442 U. S., at 608–609; *Goss* v. *Lopez*, 419 U. S. 565, 583 (1975); *Wolff* v. *McDonnell*, 418 U. S., at 570.

Thus none of our cases dealing with constitutionally required representation by counsel requires the conclusion reached by the District Court. Especially in light of the Government interests at stake, the evidence adduced before the District Court as to success rates in claims handled with or without lawyers shows no such great disparity as to warrant the inference that the congressional fee limitation under consideration here violates the Due Process Clause of the Fifth Amendment. What evidence we have been pointed to in the record regarding complex cases falls far short of the kind which would warrant upsetting Congress' judgment that this is the manner in which it wishes claims for veterans' benefits adjudicated. *Schweiker* v. *McClure*, 456 U. S. 188, 200 (1982); *Mathews*, 424 U. S., at 344, 349. The District Court abused its discretion in holding otherwise.

## IV

Finally, we must address appellees' suggestion that the fee limitation violates their First Amendment rights. Appellees claim that cases such as *Mine Workers* v. *Illinois State Bar Assn.*, 389 U. S. 217 (1967), and *Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar*, 377 U. S. 1 (1964), establish for individuals and organizations a right to ensure "meaningful access to courts" for themselves or their members, and that the District Court was correct in holding that this right was violated by the fee limitation. There are numerous conceptual difficulties with extending the cited cases to cover the situation here; for example, those cases involved the rights of unions and union members to retain or recommend counsel

for proceedings where counsel were allowed to appear, and the First Amendment interest at stake was primarily the right to associate collectively for the common good. In contrast, here the asserted First Amendment interest is primarily the individual interest in best prosecuting a claim, and the limitation challenged applies across-the-board to individuals and organizations alike.

But passing those problems, appellees' First Amendment arguments, at base, are really inseparable from their due process claims. The thrust is that they have been denied "meaningful access to the courts" to present their claims. This must be based in some notion that VA claimants, who presently are allowed to speak in court, and to have someone speak for them, also have a First Amendment right to pay their surrogate speaker;[13] beyond that questionable proposition, however, even as framed appellees' argument recognizes that such a First Amendment interest would attach only in the absence of a "meaningful" alternative. The foregoing analysis of appellees' due process claim focused on substantially the same question—whether the process allows a claimant to make a meaningful presentation—and we concluded that appellees had such an opportunity under the present claims process, and that significant Government interests favored the limitation on "speech" that appellees attack. Under those circumstances appellees' First Amendment claim has no independent significance. The decision of the District Court is accordingly

*Reversed.*

---

[13] The dissent quotes from our decision in *FEC* v. *National Conservative Political Action Committee*, 470 U. S. 480, 493 (1985), *post*, at 364, n. 13, as if the analysis in that case answers the issues raised here. One would think that another proposition "so obvious that [it] seldom need[s] to be stated explicitly," *post*, at 368, n. 16, is that the constitutional analysis of a regulation that restricts core political speech, such as the regulation at issue in *FEC*, will differ from the constitutional analysis of a restriction on the available resources of a claimant in Government benefit proceedings.

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN joins, concurring.

I join the Court's opinion and its judgment because I agree that this Court has appellate jurisdiction under 28 U. S. C. § 1252 and that the District Court abused its discretion in issuing a nationwide preliminary injunction against enforcement of the $10 fee limitation in 38 U. S. C. § 3404(c). I also agree that the record before us is insufficient to evaluate the claims of any individuals or identifiable groups. I write separately to note that such claims remain open on remand.

The grant of appellate jurisdiction under § 1252 does not give the Court license to depart from established standards of appellate review. This Court, like other appellate courts, has always applied the "abuse of discretion" standard on review of a preliminary injunction. See, *e. g., Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 931–932 (1975). As the Court explains, direct appeal of a preliminary injunction under § 1252 is appropriate in the rare case such as this where a district court has issued a nationwide injunction that in practical effect invalidates a federal law. In such circumstances, § 1252 "assure[s] an expeditious means of affirming or removing the restraint on the Federal Government's administration of the law . . . ." *Heckler* v. *Edwards,* 465 U. S. 870, 882 (1984). See also *id.,* at 881, nn. 15 and 16 (§ 1252 is closely tied to the need to speedily resolve injunctions preventing the effectuation of Acts of Congress). Contrary to the suggestion of JUSTICE BRENNAN, *post,* at 355, the Court fully effectuates the purpose of § 1252 by vacating the preliminary injunction which the District Court improperly issued. Since the District Court did not reach the merits, any cloud on the constitutionality of the $10 fee limitation that remains after today's decision is no greater than exists prior to judgment on the merits in any proceeding questioning a statute's constitutionality.

A preliminary injunction is only appropriate where there is a demonstrated likelihood of success on the merits. *Doran*

v. *Salem Inn, Inc., supra.* In order to justify the sort of categorical relief the District Court afforded here, the fee limitation must pose a risk of erroneous deprivation of rights in the generality of cases reached by the injunctive relief. Cf. *Mathews* v. *Eldridge*, 424 U. S. 319, 344 (1976). Given the nature of the typical claim and the simplified Veterans' Administration procedures, the record falls short of establishing any likelihood of such sweeping facial invalidity. *Ante*, at 329–330.

As the Court observes, the record also "is . . . short on definition or quantification of 'complex' cases" which might constitute a "group" with respect to which the process provided is "[in]sufficient for the large majority." *Ante*, at 329, 330; *Parham* v. *J. R.*, 442 U. S. 584, 617 (1979). The "determination of what process is due [may] var[y]" with regard to a group whose "situation differs" in important respects from the typical veterans' benefit claimant. *Parham* v. *J. R.*, *supra*, at 617. Appellees' claims, however, are not framed as a class action nor were the lower court's findings and relief narrowly drawn to reach some discrete class of complex cases. In its present posture, this case affords no sound basis for carving out a subclass of complex claims that by their nature require expert assistance beyond the capabilities of service representatives to assure the veterans " '[a] hearing appropriate to the nature of the case.' " *Boddie* v. *Connecticut*, 401 U. S. 371, 378 (1971), quoting *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950). *Ante*, at 329.

Nevertheless, it is my understanding that the Court, in reversing the lower court's preliminary injunction, does not determine the merits of the appellees' individual "as applied" claims. The complaint indicates that appellees challenged the fee limitation both on its face and as applied to them, and sought a ruling that they were entitled to a rehearing of claims processed without assistance of an attorney. I App. 39–42. Appellee Albert Maxwell, for example, alleges that

his service representative retired and failed to notify him that he had dropped his case. Mr. Maxwell's records indicate that he suffers from the after effects of malaria contracted in the Bataan death march as well as from multiple myelomas allegedly a result of exposure to radiation when he was a prisoner of war detailed to remove atomic debris in Japan. *Id.*, at 45–89. Maxwell contends that his claims have failed because of lack of expert assistance in developing the medical and historical facts of his case. As another example, Doris Wilson, a widow who claims her husband's cancer was contracted from exposure to atomic testing, alleges her service representative waived her right to a hearing because he was unprepared to represent her. She contends her claim failed because she was unable without assistance to obtain service records and medical information. *Id.*, at 217.

The merits of these claims are difficult to evaluate on the record of affidavits and depositions developed at the preliminary injunction stage. Though the Court concludes that denial of expert representation is not *"per se* unconstitutional," given the availability of service representatives to assist the veteran and the Veterans' Administration boards' emphasis on nonadversarial procedures, "[o]n remand, the District Court is free to and should consider any individual claims that [the procedures] did not meet the standards we have described in this opinion." *Parham* v. *J. R., supra*, at 616–617.

Justice Brennan, with whom Justice Marshall joins, dissenting.

The Court today concludes that it has mandatory jurisdiction pursuant to 28 U. S. C. § 1252 directly to review the District Court's entry of a preliminary injunction restraining the Government from enforcing the provisions of 38 U. S. C. §§ 3404 and 3405 pending a full trial on the merits of appellees' contention that those statutes violate the First and

Fifth Amendments. *Ante*, at 316–319.[1] The Court then proceeds to sustain the constitutionality of those statutes on the ground that "the process allows a claimant to make a meaningful presentation" on behalf of his claim for service-connected death and disability benefits even without the assistance of his attorney. *Ante*, at 335. The Court having reached this issue, I feel constrained to note my strong disagreement on the merits for the reasons eloquently set forth in JUSTICE STEVENS' dissent, which I join.

I write separately, however, because I believe the Court's exercise of appellate jurisdiction in this case is not authorized by § 1252. Because the District Court's interlocutory order granting a preliminary injunction did not constitute a decision striking down the challenged statutes on constitutional grounds, appellate review of the propriety and scope of the preliminary injunction instead rests initially in the Court of Appeals for the Ninth Circuit pursuant to 28 U. S. C. § 1292(a)(1), from which review in this Court could then be sought through a petition for a writ of certiorari. The Court's decision to the contrary is wholly inconsistent with the purpose and history of § 1252, well-established principles respecting interlocutory review of preliminary injunctions, and common sense.

I

The District Court did not hold that §§ 3404 and 3405 are unconstitutional either on their face or as applied. Instead, for purposes of considering the appellees' motion for a pretrial preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, it found that appellees had

---

[1] Title 38 U. S. C. § 3404 prohibits a veteran or his survivors from paying more than $10 to an attorney for assistance in attempting to obtain service-connected death and disability benefits, and § 3405 provides that any attorney who receives more than $10 in these circumstances "shall be fined not more than $500 or imprisoned at hard labor for not more than two years, or both."

"demonstrated a high likelihood of prevailing" on the merits of their due process and First Amendment challenges. 589 F. Supp. 1302, 1323 (ND Cal. 1984); see also *id.*, at 1307, 1327, 1329. The court then weighed the potential for irreparable injury and the balance of hardships in light of this *likelihood* of success. It found that the appellees had "shown the irreparable injury necessary to obtain injunctive relief" and concluded that "the balance of hardship also weighs heavily in [their] favor." *Id.*, at 1329.[2] Accordingly, the court entered a broad preliminary injunction restraining enforcement of the challenged statutes "pending a trial on the merits of the above-entitled action." *Ibid.* As this Court was advised at oral argument, the appellees contemplate further extensive

---

[2] The court noted that "the government has submitted absolutely no evidentiary support" for its claim of potential hardship from the entry of preliminary relief. 589 F. Supp., at 1328, n. 23. Appellees, on the other hand, had pointed to a number of alleged hardships in support of their motion: (1) "a substantial number of SCDDC Claimants who would be forced to proceed without a lawyer during the pendency of this litigation would go on to lose or abandon their claims"; (2) "the fee limitation exacts a heavy toll in terms of Claimants' ability to petition the V. A. for a redress of grievances, access to the V. A., and fundamental rights of free speech and association," it being well established that the "loss of First Amendment freedoms, even temporarily, constitutes irreparable injury"; and (3) "many veterans, and particularly those whose cancer claims arise out of radiation or Agent Orange exposure such as Maxwell, Cordray and Warehime, may die prior to trial on the merits. For these veterans, the instant motion is their *only* opportunity for redress. Indeed, one of the intended plaintiffs herein, Charles Targett, died of brain cancer before this action could even be filed." Plaintiffs' Memorandum of Points and Authorities in Support of Application for a Preliminary Injunction, No. C–83–1861–MHP, pp. 17–19 (ND Cal. Nov. 14, 1983) (emphasis added) (Preliminary Injunction Memorandum). See also Exhibit E, Declaration of Gordon P. Erspamer ¶ 3, attached to Preliminary Injunction Memorandum ("Based upon my knowledge of the medical conditions of Messrs. Maxwell, Cordray and Warehime, and my acquaintance with their medical records, I believe, regrettably, there is a substantial possibility that one or more of them will not survive through trial").

discovery and a full trial on the underlying First and Fifth Amendment issues. Tr. of Oral Arg. 31–32.[3]

Contrary to the Court's assertion, there is much more than a "semantic difference" between a finding of likelihood of success sufficient to support preliminary relief and a final holding on the merits. *Ante*, at 317. Until today, the Court always has recognized that district court findings on "likelihood of success on the merits" are *not* "tantamount to decisions on the underlying merits"; the two are "significantly different." *University of Texas* v. *Camenisch*, 451 U. S. 390, 393–394 (1981). Preliminary injunctions are granted on the basis of a broad "balance of factors" determined through "procedures that are less formal and evidence that is less complete than in a trial on the merits," and the parties are accorded neither "a full opportunity to present their cases nor . . . a final judicial decision based on the *actual* merits of a controversy." *Id.*, at 395–396 (emphasis added). District court orders granting preliminary injunctions may therefore be reviewed only on an abuse-of-discretion standard: an appellate court may conclude that the district court's preliminary relief sweeps too broadly, or is based on an improper balancing of hardships, or even that the likelihood of success has been overdrawn. See generally *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931–932 (1975); *Brown* v. *Chote*, 411 U. S. 452, 457 (1973). But under the abuse-of-discretion standard, appellate courts obviously may "intimate no view as to the ultimate merits" of the underlying controversy. *Doran* v. *Salem Inn, Inc., supra*, at 934; *Brown* v. *Chote, supra*, at 457.[4] For several reasons, this is particularly true

---

[3] As the District Court observed, "[a]t oral argument [before that court] attorneys for both plaintiffs and defendants agreed that this was a motion solely for preliminary injunctive relief and not for permanent injunctive relief." 589 F. Supp., at 1307, n. 5.

[4] See generally *United States* v. *Corrick*, 298 U. S. 435 (1936); *Alabama* v. *United States*, 279 U. S. 229 (1929); *United Fuel Gas Co.* v. *Public Serv-*

where "grave, far-reaching constitutional questions" are presented: the records developed in preliminary-injunction cases are "simply insufficient" to allow a final decision on the merits; as a matter of fairness the litigants are entitled to a full evidentiary presentation before a final decision is reached; and where questions of constitutional law turn on disputed fact,[5] such decisions must initially be rendered by a district court factfinder. *Brown* v. *Chote, supra,* at 457.

Section 1252 does not empower this Court directly to police the preliminary-injunctive process in the district courts. Instead, it was enacted to ensure the "prompt determination by the court of last resort of disputed questions of the *constitutionality* of acts of the Congress."[6] Whether one relies on

---

*ice Comm'n of West Virginia,* 278 U. S. 322 (1929); R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court of the United States §§ 196, 208, 217 (1951).

[5] As in the due process balancing inquiry conducted by the District Court in this case pursuant to *Mathews* v. *Eldridge,* 424 U. S. 319 (1976).

[6] H. R. Rep. No. 212, 75th Cong., 1st Sess., 2 (1937) (emphasis added). See also H. R. Conf. Rep. No. 1490, 75th Cong., 1st Sess. (1937); S. Rep. No. 963, 75th Cong., 1st Sess. (1937). Remarks during floor debate reinforce the conclusion that § 1252 was intended to provide mandatory Supreme Court review only where the underlying constitutional issue was properly presented for dispositive resolution. See, *e. g.,* 81 Cong. Rec. 3254 (1937) (remarks of Rep. Sumners) (provision would enable an appeal "directly to the Supreme Court from an adverse decision on the question of constitutionality"); *id.,* at 3256 (remarks of Rep. Brewster) (provision designed to "obviate delays in our courts so far as determination of constitutional questions is concerned"); *id.,* at 3260–3261 (remarks of Rep. Sumners) (case "would come up on the question of constitutionality"; "[w]hen the question of the constitutionality of an act of Congress is raised, and it is a serious question, it is the judgment of the members of the committee that that question ought to be presented to the Supreme Court just as quickly as it can be carried there properly"); *id.,* at 3267 (remarks of Rep. McFarlane) (provision would "expedite the testing of the constitutionality of acts of Congress"); *id.,* at 3272 (remarks of Rep. Sumners) ("where . . . the decision is adverse to the constitutionality of the act in question, the Government, in such event, may appeal directly to the Supreme Court in order to expedite the determination of the constitutional question"). See also Frankfurter & Fisher, The Business of the Supreme Court at the

the codified language—permitting a direct appeal from a lower-court decision *"holding* an Act of Congress unconstitutional"[7]—or on the original language of the statute—permitting a direct appeal where "the decision is *against* the constitutionality of any Act of Congress"[8]—it is obvious that

---

October Terms, 1935 and 1936, 51 Harv. L. Rev. 577, 614, 616–617 (1938) (the "essence" of the legislation now codified as § 1252 was to ensure "a speedy test" of the constitutionality of a federal statute by promptly "securing the final word from the Supreme Court").

[7] Title 28 U. S. C. § 1252 provides in full:

"Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam and the District Court of the Virgin Islands and any court of record of Puerto Rico, holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party.

"A party who has received notice of appeal under this section shall take any subsequent appeal or cross appeal to the Supreme Court. All appeals or cross appeals taken to other courts prior to such notice shall be treated as taken directly to the Supreme Court."

[8] The Judiciary Act of 1937, § 2, 50 Stat. 752, provided in full:

"In any suit or proceeding in any court of the United States to which the United States, or any agency thereof, or any officer or employee thereof, as such officer or employee, is a party, or in which the United States has intervened and become a party, and in which the decision is against the constitutionality of any Act of Congress, an appeal may be taken directly to the Supreme Court of the United States by the United States or any other party to such suit or proceeding upon application therefor or notice thereof within thirty days after the entry of a final or interlocutory judgment, decree, or order; and in the event that any such appeal is taken, any appeal or cross-appeal by any party to the suit or proceeding taken previously, or taken within sixty days after notice of an appeal under this section, shall also be or be treated as taken directly to the Supreme Court of the United States. In the event that an appeal is taken under this section, the record shall be made up and the case docketed in the Supreme Court of the United States within sixty days from the time such appeal is allowed, under such rules as may be prescribed by the proper courts. Appeals under this section shall be heard by the Supreme Court of the United States at the earliest possible time and shall take precedence over all other matters not of a

§ 1252 contemplates a fully consummated lower-court decision of unconstitutionality so that this Court may carry out the statutory purpose of rendering a prompt and dispositive determination respecting the constitutionality of the challenged legislation. Jurisdiction pursuant to § 1252 accordingly is proper *only* where "the basis of the decision below *in fact* was that the Act of Congress was unconstitutional," *United States* v. *Raines,* 362 U. S. 17, 20 (1960) (emphasis added)[9]—and "likelihood" simply does not equate with "in fact." Where a district court merely has concluded that there is a "likelihood" of unconstitutionality sufficient to support temporary relief, § 1252's underlying purpose cannot be fulfilled because this Court (if faithful to precedent) cannot resolve the "ultimate merits" of the underlying constitutional issue. *Doran* v. *Salem Inn, Inc.,* 422 U. S., at 934; *Brown* v. *Chote,* 411 U. S., at 457. Instead, all the Court could do would be to consider whether the nature or scope of preliminary relief constituted abuses of discretion, and perhaps to disagree with the district court respecting the "likelihood" that the appellees ultimately would prevail. In my opinion, these questions relating to the supervision of the injunctive process are not subsumed in § 1252 and properly are left in the first instance to the courts of appeals.

The Court argues, however, that because § 1252 explicitly grants jurisdiction to this Court "from an *interlocutory* or final judgment" of unconstitutionality, Congress surely intended to include preliminary injunctions granted on "likelihood of success" within the scope of § 1252. *Ante,* at 316–317, 318–319. The Court reinforces this argument by noting

_____

like character. This section shall not be construed to be in derogation of any right of direct appeal to the Supreme Court of the United States under existing provisions of law."

[9] See also *Heckler* v. *Edwards,* 465 U. S. 870, 877 (1984); *McLucas* v. *DeChamplain,* 421 U. S. 21, 30–31 (1975); *United States* v. *Christian Echoes National Ministry, Inc.,* 404 U. S. 561, 563–566 (1972) *(per curiam); Fleming* v. *Rhodes,* 331 U. S. 100, 103–104 (1947); *Garment Workers* v. *Donnelly Garment Co.,* 304 U. S. 243, 249 (1938).

that *all* interlocutory decisions, even if cast in dispositive terms, "are subject to revision" before entry of final judgment. *Ante*, at 317. This argument is wholly unpersuasive. As demonstrated by the large body of precedent applying 28 U. S. C. §§ 1291 and 1292(a), there is a substantial difference between interlocutory decisions that are "tentative, informal or incomplete"[10] and those that for all practical purposes "conclusively determine the disputed question."[11] Interlocutory decisions falling within the latter category may, in a small set of circumstances, be immediately appealed because they represent "fully consummated decisions" on the matter in question that are capable of being reviewed and dispositively affirmed or reversed.[12] The "bare fact"[13] that every order short of a final decree is theoretically "subject to reopening at the discretion of the district judge" is insufficient to preclude review in these circumstances.[14] Instead, interlocutory appeals to the courts of appeals pursuant to §§ 1291 and 1292(a) are proper when no further consideration of the disputed issue is contemplated by the district court and when, as a practical matter, there is "no basis to suppose" that the resolution is anything less than definite.[15]

Where the disputed decision "remains open, unfinished or inconclusive," on the other hand, it is well established that under §§ 1291 and 1292(a) "there may be no intrusion by appeal" of the unresolved issue.[16] The reasons are manifest. If the appellate court addressed the issue in such an inconclu-

---

[10] *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541, 546 (1949).

[11] *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 468 (1978).

[12] *Abney* v. *United States*, 431 U. S. 651, 659 (1977).

[13] 15 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3911, p. 470 (1976) (Wright, Miller, & Cooper).

[14] *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 12 (1983).

[15] *Id.*, at 13. See generally *Firestone Tire & Rubber Co.* v. *Risjord*, 449 U. S. 368, 375 (1981); *United States* v. *MacDonald*, 435 U. S. 850, 854–855 (1978); *Eisen* v. *Carlisle & Jacquelin*, 417 U. S. 156, 172 (1974).

[16] *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S., at 546.

sive posture, it either would render an advisory opinion that had no binding effect or, if binding effect were intended, would usurp the authority of the district court to pass on the issue in the first instance. "Appeal gives the upper court a power of review, not one of intervention."[17]

This elementary distinction applies with direct force to appeals pursuant to § 1252.[18] Where a district court issues an interlocutory order based on a fully consummated determination that a federal statute is unconstitutional, an appeal is proper because the constitutional question can authoritatively be decided with dispatch. Thus in *Fleming* v. *Rhodes*, 331 U. S. 100, 102 (1947), the District Court had denied preliminary relief enjoining the eviction of tenants on the ground that the federal statute prohibiting the evictions was unconstitutional. And in *McLucas* v. *DeChamplain*, 421 U. S. 21, 26–27 (1975), the District Court for the District of Columbia had preliminarily enjoined the enforcement of a statute in reliance on a decision by the Court of Appeals for the District of Columbia Circuit that the statute was unconstitutional — "a decision," we noted, that was "binding on the District Court," *id.*, at 28. In neither case was there any basis to believe that the interlocutory holding of unconstitutionality was anything but final.

On the other hand, we have *never* in the 48-year history of § 1252 assumed jurisdiction where the district court had done no more than simply determine that there was a "likelihood" of unconstitutionality sufficient to support temporary relief pending a final decision on the merits. Because such deter-

---

[17] *Ibid.* See also *Stack* v. *Boyle*, 342 U. S. 1, 12 (1951) (opinion of Jackson, J.) ("[I]t is a final *decision* that Congress has made reviewable. . . . While a final judgment always is a final decision, there are instances in which a final decision is not a final judgment") (emphasis in original).

[18] Similar distinctions have evolved concerning the scope of our jurisdiction over "final" state-court judgments or decrees pursuant to 28 U. S. C. § 1257. See, *e. g.*, *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 476–487 (1975); *Construction Laborers* v. *Curry*, 371 U. S. 542, 548–551 (1963).

minations are inherently "open, unfinished [and] inconclusive,"[19] the only proper questions for immediate appellate consideration would be whether the entry and scope of preliminary relief were abuses of discretion. But such review is not the purpose of § 1252 because, as the Court today concedes, "it was the *constitutional* question that Congress wished this Court to decide." *Ante,* at 318 (emphasis added).[20] If the Court did address the constitutional issue in these circumstances, it either would be rendering an advisory opinion subject to revision once the district court reached the merits or, to the extent it purported to pass on the issue with finality, would be exercising a forbidden "power . . . of intervention" rather than of review.[21] We have long recognized that such intervention is barred under §§ 1291 and 1292(a), and should have so recognized here as well.[22]

---

[19] *Cohen* v. *Beneficial Industrial Loan Corp., supra,* at 546.

[20] "When Congress created the exceptional right to bypass the court of appeals, it directly linked that right to a lower court's invalidation of an Act of Congress. Although it is in the nature of cases and controversies that the court's judgment may address not only the issue of statutory constitutionality, but other issues as well, such as attorney's fees, *remedy,* or related state-law claims, the natural sense of the jurisdictional provision is that *the holding of statutory unconstitutionality, not these other issues, is what Congress wished this Court to review in the first instance.*

"Because direct review is linked to a court's holding a federal statute unconstitutional, the logical test of which appeals from a judgment must be brought directly to this Court and which, standing alone, must follow the normal route of appellate review, *is whether the issue on appeal is the holding of statutory unconstitutionality.*" *Heckler* v. *Edwards,* 465 U. S., at 880 (emphasis added).

[21] *Cohen* v. *Beneficial Industrial Loan Corp., supra,* at 546.

[22] The Court argues that the finality issue is a "bit of a red herring" given that the original version of § 1252, see n. 8, *supra,* provided jurisdiction over decisions "against the constitutionality of any Act of Congress," and that "[a]ny fair reading of the decision at issue would conclude that it is 'against the constitutionality'" of the challenged statutes. *Ante,* at 318. I disagree. *Every* district court order in litigation such as this that denies a motion to dismiss or for summary judgment, grants a temporary restraining order, see n. 26, *infra,* or even allows discovery to proceed based on the substantiality of the plaintiff's claim could be characterized as being

The Court contends, however, that the District Court in this case enjoined the challenged statute "across the country and under all circumstances," and that immediate *mandatory* appeal to this Court therefore "is in accord with the purpose of the statutory grant"—provision of "an expeditious means for ensuring certainty and uniformity in the enforcement of such an Act." *Ante*, at 318–319. See also *ante*, at 336–337 (O'CONNOR, J., concurring). Congress unquestionably intended by § 1252 to provide an "expeditious" means for resolving constitutional questions,[23] but an appeal is proper only when it is those questions themselves that have been decided—a condition not met in preliminary-injunction cases where, as here, we may "intimate no view as to the ultimate merits" of the underlying controversy. *Doran* v. *Salem Inn, Inc.*, 422 U. S., at 934.

Moreover, the Court's reasoning sweeps both too narrowly and too broadly. It sweeps too narrowly because mandatory jurisdiction pursuant to § 1252 is not confined to district court decisions striking down statutes "across the country and under all circumstances." *Ante*, at 319. See also *ante*, at 336 (O'CONNOR, J., concurring). We have instead long recognized that § 1252 requires that we review decisions that simply invalidate challenged statutes even as applied only to particular individuals in particular circumstances.[24] Allow-

---

"against" the validity of a statute in the sense that it is not squarely "for" the statute, else the litigation would be terminated. Preliminary injunctions based on "likelihood" of success do, to be sure, represent a more definite degree of doubt respecting the statute than, say, an order denying summary judgment based on "genuine issues" remaining. Cf. Fed. Rule Civ. Proc. 56(c). But these are differences of degree and not of kind. A decision cannot squarely be "against" the constitutionality of a statute if the constitutional question is still "open, unfinished [and] inconclusive." *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S., at 546.

[23] See legislative history discussed in n. 6, *supra*.

[24] See, *e. g.*, *EEOC* v. *Wyoming*, 460 U. S. 226, 229 (1983); *California* v. *Grace Brethren Church*, 457 U. S. 393, 404–407 (1982); *United States* v. *Lee*, 455 U. S. 252, 256 (1982); *United States* v. *Darusmont*, 449 U. S. 292, 293 (1981) *(per curiam)*.

ing an immediate appeal in these circumstances is thought to further the "great public interest" in securing "prompt determinations" of the validity of lower court precedent that might have binding effect in cases beyond the one at hand.[25] Where a district court simply has granted a preliminary injunction—or for that matter a temporary restraining order[26]—barring enforcement of a statute as applied to certain individuals, the precedential effect is far more obscure. Such orders are based on a case-specific balancing of the equities that may well not carry over into other situations. It is simply too burdensome for this Court to bear *mandatory* direct jurisdiction over every preliminary injunction, temporary restraining order, and other pretrial order in cases potentially implicating the constitutionality of federal statutes. The Court might respond that § 1252 appeals in this context can be limited to preliminary relief having nationwide impact, but this would be bootstrap reasoning without support in our precedents: the propriety of an appeal under § 1252 turns not on the *scope* of the potential impact, but on the underlying *nature* of the district court's determination.[27]

---

[25] *Fleming* v. *Rhodes*, 331 U. S., at 104.

[26] Temporary restraining orders generally cannot be granted absent a showing of reasonable probability of eventual success on the merits although, as in preliminary-injunction cases, the degree of required probability may vary depending on the extent of irreparable injury and the balance of hardships. See 11 Wright, Miller, & Cooper § 2951, at 507–510. The Court's reasoning therefore extends without apparent limitation to all temporary restraining orders issued in litigation challenging the constitutionality of federal statutes.

[27] "Congress did not enact an open-ended 'impact' test for determining which cases should come to this Court for direct review. Although remedial aspects of a case are important, the touchstone of direct appeal under § 1252 is not a party's or our own judgment of the significance of a decision. We exercise that judgment under our discretion to grant certiorari in any civil or criminal case before, as well as after, rendition of judgment. 28 U. S. C. § 1254(1); this Court's Rule 18. In § 1252, Congress mandated direct review not simply for decisions with impact, but rather for decisions

The Court's reasoning sweeps too broadly because there are means other than an expansive reading of § 1252 to ensure that improvident district court injunctions based on "likelihood of success" do not impede the effective functioning of the Federal Government.   As Congress has emphasized, "[s]wift judicial review can be had in cases where the public interest requires it" through means short of mandatory appeals jurisdiction.[28]   Pursuant to 28 U. S. C. § 1292(a), for example, the courts of appeals may promptly review district court orders granting or denying preliminary injunctions. Courts of appeals routinely supervise the trial-court injunctive process and are therefore in a far superior position to pass initially on questions of irreparable injury, balance of hardships, and abuse of discretion.[29]   Moreover, if the question whether a district court abused its discretion in issuing preliminary relief "is of such imperative public importance as to justify the deviation from normal appellate practice and to require immediate settlement in this Court," this Court's Rule 18, certiorari review can be obtained before the court of appeals renders judgment.   See 28 U. S. C. § 2101(e).   This Court has not hesitated to exercise this power of swift intervention in cases of extraordinary constitutional moment and

whose impact was predicated upon" a lower-court holding that an Act of Congress is unconstitutional.   *Heckler* v. *Edwards,* 465 U. S., at 884.

There is an additional reason why today's jurisdictional decision will bring every order granting preliminary relief in single as-applied cases directly before the Court: jurisdictional rules must be clear cut and cannot turn on indefinite notions of "importance" or "wide-ranging impact." "[L]itigants ought to be able to apply a clear test to determine whether, as an exception to the general rule of appellate review, they must perfect an appeal directly to the Supreme Court."   *Id.,* at 877.

[28] S. Rep. No. 94–204, p. 11 (1975).   This Report pertained to Congress' repeal of the three-judge district court provisions of 28 U. S. C. § 2282 (1970 ed.), discussed *infra,* at 351–354, and nn. 32–35.

[29] See generally 7 J. Moore, J. Lucas, & K. Sinclair, Moore's Federal Practice, ch. 65 (1985); 11 Wright, Miller, & Cooper §§ 2947–2950.

in cases demanding prompt resolution for other reasons.[30] Under this procedure, the Court has discretion to limit immediate review to exceptional cases and to leave initial review of most matters in the courts of appeals—which of course "recognize the vital importance of the time element" in constitutional challenges involving the granting or denial of interlocutory relief.[31]   Under today's construction of § 1252, however, the Court has no such discretion and accordingly has, I respectfully submit, expanded its mandatory docket to matters that we have no business resolving in the first instance.

One final consideration, based on the history of § 1252 and related provisions, sheds further light on the fallacy of the Court's jurisdictional reasoning.   Section 1252 originally was enacted as § 2 of the Judiciary Act of 1937, 50 Stat. 752. Section 3 of that Act created the since-repealed three-judge district court provisions of 28 U. S. C. § 2282 (1970 ed.). Section 3 provided that "[n]o interlocutory or permanent injunction suspending or restraining the enforcement, operation, or execution of, or setting aside, in whole or in part, any Act of Congress" in cases challenging the constitutionality of the Act could be granted unless presented to and resolved by a three-judge district court.   That section also contained its own built-in jurisdictional authorization for direct Supreme Court review of any "order, decree, or judgment" issued by

---

[30] See, e. g., United States v. Nixon, 418 U. S. 683, 686–687 (1974) (certiorari granted before judgment by the Court of Appeals "because of the public importance of the issues presented and the need for their prompt resolution"); Youngstown Sheet & Tube Co. v. Sawyer, 343 U. S. 579 (1952); United States v. Mine Workers, 330 U. S. 258 (1947); Ex parte Quirin, 317 U. S. 1 (1942); Carter v. Carter Coal Co., 298 U. S. 238 (1936); Railroad Retirement Board v. Alton R. Co., 295 U. S. 330 (1935); United States v. Bankers Trust Co., decided together with Norman v. Baltimore & Ohio R. Co., 294 U. S. 240 (1935).

[31] Aaron v. Cooper, 357 U. S. 566, 567 (1958); see also Cooper v. Aaron, 358 U. S. 1, 13 (1958).

such a court granting or denying "an interlocutory or permanent injunction in such case." Moreover, § 3 provided that a single district judge could enter a "temporary stay or suspension, in whole or in part," of the enforcement of the challenged statute "until decision upon the application," provided that the applicant made a sufficient showing of, *inter alia,* "irreparable loss or damage."[32]

---

[32] Section 3 provided in full:

"No interlocutory or permanent injunction suspending or restraining the enforcement, operation, or execution of, or setting aside, in whole or in part, any Act of Congress upon the ground that such or any part thereof is repugnant to the Constitution of the United States shall be issued or granted by any district court of the United States, or by any judge thereof, or by any circuit judge acting as a district judge, unless the application for the same shall be presented to a circuit or district judge, and shall be heard and determined by three judges, of whom at least one shall be a circuit judge. When any such application is presented to a judge, he shall immediately request the senior circuit judge (or in his absence, the presiding circuit judge) of the circuit in which such district court is located to designate two other judges to participate in hearing and determining such application. It shall be the duty of the senior circuit judge or the presiding circuit judge, as the case may be, to designate immediately two other judges from such circuit for such purpose, and it shall be the duty of the judges so designated to participate in such hearing and determination. Such application shall not be heard or determined before at least five days' notice of the hearing has been given to the Attorney General and to such other persons as may be defendants in the suit: Provided, That if of opinion that irreparable loss or damage would result to the petitioner unless a temporary restraining order is granted, the judge to whom the application is made may grant such temporary restraining order at any time before the hearing and determination of the application, but such temporary restraining order shall remain in force only until such hearing and determination upon notice as aforesaid, and such temporary restraining order shall contain a specific finding, based upon evidence submitted to the court making the order and identified by reference thereto, that such irreparable loss or damage would result to the petitioner and specifying the nature of the loss or damage. The said court may, at the time of hearing such application, upon a like finding, continue the temporary stay or suspension, in whole or in part, until decision upon the application. The hearing upon any such application for an interlocutory or permanent injunction shall be given precedence and shall be in every way expedited and be assigned for a hearing at the earli-

The history of § 3 is relevant to the instant question in two respects. First, this Court has held flatly that temporary relief granted by a single district judge pending the convening of a three-judge court is reviewable in the first instance by the courts of appeals and not on direct appeal to this Court. See, *e. g.*, *Hicks* v. *Pleasure House, Inc.*, 404 U. S. 1, 3 (1971) *(per curiam)* (preliminary relief "issued pursuant to [28 U. S. C.] § 2284(3) is reviewable in a court of appeals to the extent that any such order is reviewable under 28 U. S. C. §§ 1291 and 1292(a)").[33] It would have made no sense to channel appeals of such orders under § 3 to the courts of appeals while channeling appeals of *identical* preliminary orders in cases that might ultimately fall within § 2 to this Court in the first instance.

Second, when Congress repealed § 2282 in 1976[34] it specifically considered the question of the best means for policing the injunctive process in constitutional challenges pending decision on the underlying merits. Whereas review of three-judge interlocutory orders in such cases formerly had been routed directly to this Court, see §§ 2282, 2283 (1970 ed.), Congress believed that interlocutory review in the courts of

---

est practicable day. An appeal may be taken directly to the Supreme Court of the United States upon application therefor or notice thereof within thirty days after the entry of the order, decree, or judgment granting or denying, after notice and hearing, an interlocutory or permanent injunction in such case. In the event that an appeal is taken under this section, the record shall be made up and the case docketed in the Supreme Court of the United States within sixty days from the time such appeal is allowed, under such rules as may be prescribed by the proper courts. Appeals under this section shall be heard by the Supreme Court of the United States at the earliest possible time and shall take precedence over all other matters not of a like character. This section shall not be construed to be in derogation of any right of direct appeal to the Supreme Court of the United States under existing provisions of law."

[33] Title 28 U. S. C. § 2284(3) derives in part from the portions of § 3 discussed above in text, and provides that a district judge may grant a temporary restraining order pending hearing and disposition of the underlying merits by a three-judge district court.

[34] See Pub. L. 94–381, § 2, 90 Stat. 1119.

appeals pursuant to §§ 1291 and 1292(a) would be most consistent with sound judicial administration.

"One other concern of the committee was the review of the granting, or the denial, of a stay of an injunction by a district court. The committee believes that with appeals of these cases clearly vested in the 11 Circuit Courts of Appeal, they will be more able than the Supreme Court to carefully consider and evaluate requests for a stay in these cases and that ample procedures exist to act effectively in these cases. See, 3 *Barron and Holtzoff* (Wright ed.) §§ 1371–78." S. Rep. No. 94–204, p. 11 (1975).[35]

Congress thereby indicated its firm intention to leave monitoring of the equitable injunctive process to the courts of appeals in the first instance, and to reserve mandatory direct Supreme Court review for those cases in which this Court properly could resolve the underlying merits of the constitutional challenges themselves.[36]

## II

Although deciding that a direct appeal of this preliminary injunction is proper, the six Members of today's majority appear to be sharply divided over the nature of the issues before us and the proper scope of our authority on review. JUSTICE O'CONNOR, joined by JUSTICE BLACKMUN, eschews any attempt to resolve the underlying merits of the constitutional challenge. She properly recognizes that, because

---

[35] The reference is to 3 W. Barron & A. Holtzoff, Federal Practice and Procedure §§ 1371–1378 (1958), which discusses, *inter alia*, the standards for staying district court orders pending appeals.

[36] Because Congress repealed the three-judge district court requirement for cases such as this and "clearly vested" review of interlocutory matters in such cases in the courts of appeals, S. Rep. No. 94–204, p. 11 (1975), the Court's reliance on precedent respecting appeals of three-judge interlocutory orders obviously is misplaced. See *ante*, at 319, citing *Goldstein* v. *Cox*, 396 U. S. 471, 476 (1970).

"[t]he merits of these claims are difficult to evaluate on the record of affidavits and depositions developed at the preliminary injunction stage," it would be improper to express any views on the merits of the appellees' as-applied challenges. *Ante*, at 338 (concurring opinion). Nor, properly, does JUSTICE O'CONNOR purport to determine the facial validity of the challenged statutes, given that the District Court has never reached a fully consummated determination on that question. Instead, she simply observes that "the record falls short of establishing any *likelihood* of such sweeping facial invalidity." *Ante*, at 337 (emphasis added). JUSTICE O'CONNOR accordingly limits her analysis to application of the abuse-of-discretion standard that governs review of preliminary-injunction orders, concluding that "the District Court abused its discretion in issuing a nationwide preliminary injunction." *Ante*, at 336. Although I find this approach far preferable to that taken by the opinion for the Court, I respectfully submit that it is inconsistent with § 1252 for two reasons: First, as set forth above, application of the abuse-of-discretion standard to the equitable process of granting preliminary relief is not subsumed in § 1252 and properly is left to the courts of appeals in the first instance. Second, this approach, by properly avoiding the ultimate resolution of the facial and as-applied constitutional challenges, has not in the slightest way furthered the underlying purpose of § 1252—ensuring the prompt and dispositive resolution of the merits of facial and as-applied constitutional challenges to federal statutes.[37]

The opinion for the Court appears to take a very different tack. To be sure, the Court notes two or three times that the District Court simply found a "likelihood" that the appel-

---

[37] If I read the various opinions in this case correctly, it appears that a majority of the Court—JUSTICES O'CONNOR and BLACKMUN in their concurring opinion, and the three Justices in dissent—has *not* determined that 38 U. S. C. §§ 3404 and 3405 are constitutional either facially or as applied to particular categories of claims.

lees after a full trial would be able to demonstrate the unconstitutionality of the challenged statutes, and it states once in passing that the District Court "abused its discretion" in so finding. *Ante*, at 312–313, 315, 334. But that is not the essence of the Court's approach. The Court repeatedly seeks to cast doubt on the bona fides of the District Court's entry of preliminary relief pursuant to Rule 65 by describing that relief in quotation marks: the District Court did not really grant a preliminary injunction, but a "preliminary injunction." *Ante*, at 308, 312, 316. Having thus suggested that the matter is one of "semantic[s]" making "little difference," *ante*, at 317, the Court proceeds to assert, repeatedly, that the District Court actually "*held* that [the $10] limit violates the Due Process Clause of the Fifth Amendment, and the First Amendment," *ante*, at 307 (emphasis added).[38] Having thus mischaracterized the District Court's decision, the Court then purports "to decide this case on the merits," *ante*, at 312, n. 5—bootstrapping its way past the rule that we may "intimate no view as to the ultimate merits" in preliminary-injunction cases[39] by observing that, under § 1252, "it was the *constitutional question* that Congress wished this Court to decide," *ante*, at 318 (emphasis added).

Having thus paved the way for its consideration of the constitutional merits, the Court then proceeds to "review" the District Court's "holding" in light of the record evidence and the three-part *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), balancing test. The Court focuses on the *Mathews* factors of the risk of an erroneous decision through the current procedures and the probable value of additional safeguards. The Court rummages through the partially developed record and seizes upon scattered evidence introduced by the Government on the eve of the preliminary-injunction hearing—evidence that never has been tested in a trial on the merits—and pronounces that evidence "reliable" and compelling. See,

[38] See also *ante*, at 312–313, 326, 334.

[39] *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 934 (1975).

*e. g., ante,* at 331.[40]   Moreover, the Court excoriates the appellees and the District Court repeatedly for failing to muster sufficient evidence to support the "holding" of unconstitutionality: the appellees made "no such" sufficient presentation of evidence, introduced "nothing" to support the "holding," and "failed to make the very difficult factual showing" necessary to support the "holding" of unconstitutionality.   *Ante,* at 326, 329, 330.[41]   The conclusion is preordained: the statutes give the appellees "an opportunity under the present claims process" to "make a meaningful presentation" without an attorney's assistance, and the District Court's "holding" of unconstitutionality must therefore be reversed.   *Ante,* at 335.

This brand of constitutional adjudication is extraordinary. Whereas JUSTICE O'CONNOR faithfully adheres to the limited role of appellate judges in reviewing preliminary injunctions and thereby departs from the purposes of § 1252, the opinion for the Court seizes upon the underlying purposes of § 1252 in order to evade the well-established rule prohibiting appellate courts from even purporting to "intimate . . . view[s]" on the ultimate merits when reviewing preliminary injunctions granted on likelihood of success.   *Doran* v. *Salem Inn, Inc.,* 422 U. S., at 934.   If the opinion for the Court turns out to be more than an unfortunate aberration, it will threaten a fundamental transformation of the equitable process of granting preliminary relief in cases challenging the constitutionality of Government action.[42]   Individual litigants seeking such

---

[40] See also *ante,* at 327–330, 330–331, n. 12.

[41] See also *ante,* at 314, and n. 6, 324, n. 11, 327–334.

[42] The Court's jurisdictional reasoning would also appear to implicate the process of reviewing federal-court preliminary relief in cases challenging the constitutionality of state statutes and state-court preliminary relief in cases challenging the constitutionality of federal statutes.   See 28 U. S. C. § 1254(2) (granting mandatory appeals jurisdiction to this Court where "a State statute [is] held by a court of appeals to be invalid as repugnant to the Constitution, treaties, or laws of the United States"); § 1257(1) (granting mandatory appeals jurisdiction over final state-court judgments and decrees where "the decision is against [the] validity" of a federal treaty or statute).

relief on grounds of irreparable injury and a balancing of hardships will essentially be required to confront the Government with both hands tied behind their backs: if they successfully obtain such relief, this Court will immediately intervene pursuant to § 1252 to review the "holding" of unconstitutionality, will make *de novo* findings that selected evidence is "reliable," will castigate the individuals for failing to adduce sufficient evidence to support the "merits" of the "holding," and will issue a ringing proclamation that the challenged statute is constitutional.

### III

I believe that § 1252 should have been construed to permit a direct appeal to this Court only from a lower court decision that represents a fully consummated determination that an Act of Congress is unconstitutional so as to permit this Court properly to resolve the constitutional question on the merits. Unlike JUSTICE O'CONNOR, I do not believe that § 1252 requires this Court directly to police the injunctive process in constitutional challenges in the first instance. Unlike the opinion for the Court, I do not believe that § 1252 may be invoked in such cases to short-circuit the process of orderly and principled constitutional adjudication. Accordingly, I believe the Court should have vacated the judgment and remanded to the District Court for the entry of a fresh decree, so that the Government could take a proper appeal of the preliminary-injunction order to the Court of Appeals for the Ninth Circuit. See, *e. g., United States* v. *Christian Echoes National Ministry*, 404 U. S. 561, 566 (1972) *(per curiam)*. The Court having decided to the contrary and having reached the merits, I join JUSTICE STEVENS' dissent.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The Court does not appreciate the value of individual liberty. It may well be true that in the vast majority of cases a veteran does not need to employ a lawyer, *ante,* at 329–330, and that the system of processing veterans benefit claims, by

and large, functions fairly and effectively without the participation of retained counsel. *Ante*, at 327. Everyone agrees, however, that there are at least some complicated cases in which the services of a lawyer would be useful to the veteran and, indeed, would simplify the work of the agency by helping to organize the relevant facts and to identify the controlling issues. *Ante*, at 328, 329. What is the reason for denying the veteran the right to counsel of his choice in such cases? The Court gives us two answers: First, the paternalistic interest in protecting the veteran from the consequences of his own improvidence, *ante*, at 323; and second, the bureaucratic interest in minimizing the cost of administering the benefit program. *Ante*, at 323–325. I agree that both interests are legitimate, but neither provides an adequate justification for the restraint on liberty imposed by the $10-fee limitation.

To explain my disagreement with the Court, I shall first add a few words about the history of the fee limitation, then identify the flaws in the Court's analysis, and finally explain why I believe § 3404(c) and § 3405 impose an unconstitutional restraint on individual liberty.

I

The first fee limitation—$5 per claim—was enacted in 1862.[1] That limitation was repealed two years later and

---

[1] Sections 6 and 7 of the Act of July 14, 1862, which authorized a grant of pensions to certain military personnel, provided as follows:

"Sec. 6. *And be it further enacted*, That the fees of agents and attorneys for making out and causing to be executed the papers necessary to establish a claim for a pension, bounty, and other allowance, before the Pension Office under this act, shall not exceed the following rates: For making out and causing to be duly executed a declaration by the applicant, with the necessary affidavits, and forwarding the same to the Pension Office, with the requisite correspondence, five dollars. In cases wherein additional testimony is required by the Commissioner of Pensions, for each affidavit so required and executed and forwarded (except the affidavits of surgeons, for which such agents and attorneys shall not be entitled to any fees,) one dollar and fifty cents.

"Sec. 7. *And be it further enacted*, That any agent or attorney who shall, directly or indirectly, demand or receive any greater compensation for his

replaced by the $10-fee limitation, which has survived ever since.[2] The limitation was designed to protect the veteran from extortion or improvident bargains with unscrupulous lawyers.[3] Obviously, it was believed that the number of scoundrels practicing law was large enough to justify a legislative prohibition against charging excessive fees.

At the time the $10-fee limitation was enacted, Congress presumably considered that fee reasonable. The legal work

---

services under this act than is prescribed in the preceding section of this act, or who shall contract or agree to prosecute any claim for a pension, bounty, or other allowance under this act, on the condition that he shall receive a per centum upon, or any portion of the amount of such claim, or who shall wrongfully withhold from a pensioner or other claimant the whole or any part of the pension or claim allowed and due to such pensioner or claimant, shall be deemed guilty of a high misdemeanor, and upon conviction thereof shall, for every such offence, be fined not exceeding three hundred dollars, or imprisoned at hard labor not exceeding two years, or both, according to the circumstances and aggravations of the offence." 12 Stat. 568.

[2] On July 4, 1864, Congress repealed the sixth and seventh sections of the 1862 Act, and substituted the following sections which raised the maximum fee to $10:

"Sec. 12. *And be it further enacted,* That the fees of agents and attorneys for making out and causing to be executed the papers necessary to establish a claim for a pension, bounty, and other allowance before the pension-office, under this act, shall not exceed the following rates: For making out and causing to be duly executed a declaration by the applicant, with the necessary affidavits, and forwarding the same to the pension-office, with the requisite correspondence, ten dollars; which sum shall be received by such agent or attorney in full for all services in obtaining such pension, and shall not be demanded or received in whole or in part until such pension shall be obtained; and the sixth and seventh sections of an act entitled 'An act to grant pensions,' approved July fourteenth, eighteen hundred and sixty-two, are hereby repealed." 13 Stat. 389.

Section 13 of the 1864 Act reenacted the criminal penalties contained in § 7 of the 1862 Act. *Ibid.* See n. 1, *supra.*

[3] See Cong. Globe, 37th Cong., 2d Sess., 2101, 3119 (1862); Cong. Globe, 41st Cong., 2d Sess., 1967, 4459 (1870). See also *Calhoun* v. *Massie,* 253 U. S. 170, 173 (1920).

involved in preparing a veteran's claim consisted of little more than filling out an appropriate form, and, in terms of the average serviceman's base pay, a $10 fee then was roughly the equivalent of a $580 fee today.[4]  At its inception, therefore, the fee limitation had neither the purpose nor the effect of precluding the employment of reputable counsel by veterans.  Indeed, the statute then, as now, expressly contemplated that claims for veterans benefits could be processed by "agents or attorneys."[5]

The fact that the statute was aimed at unscrupulous attorneys is confirmed by the provision for criminal penalties. Instead of just making an agreement to pay a greater fee unenforceable—as an anticipatory pledge of an interest in future pension benefits is unenforceable—the Act contains a flat prohibition against the direct or indirect collection of a greater fee, and provides that an attorney who charges more than $10 may be imprisoned for up to two years at hard labor.[6]  Thus, an unscrupulous moneylender or mer-

_____

[4] The base pay for all military personnel averaged $231 annually in 1865. U. S. Dept. of Commerce, Bureau of the Census, Historical Statistics of the United States, Colonial Times to 1970, Part I, p. 175 (1975).  By contrast, military base pay for all personnel averaged $13,400 in 1984.  See U. S. Dept. of Commerce, Bureau of the Census, Statistical Abstract of the United States 1985, p. 345.

[5] Today, of course, the procedures are more elaborate than they were in 1864, and the number of claims presenting complex issues of law or fact has greatly increased.  It is no longer true that the attorney would seldom, if ever, be asked to do more than fill out a simple form.

[6] Recently, we noted the effect of criminal sanctions on constitutional analysis:

"The restriction involved here is not merely an effort by the Government to regulate the use of its own property, such as was involved in *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114 (1981), or the dismissal of a speaker from Government employment, such as was involved in *Connick* v. *Myers*, 461 U. S. 138 (1983).  It is a flat, across-the-board criminal sanction . . . ."  *FEC* v. *National Conservative PAC*, 470 U. S. 480, 496 (1985).

chant who might try to take advantage of an improvident veteran might have difficulty collecting his bill, but the unscrupulous lawyer might go to jail.

The language in § 3405, particularly the use of the words "directly or indirectly," apparently would apply to consultations between a veteran and a lawyer concerning a claim that is ultimately allowed, as well as to an appearance before the agency itself. In today's market, the reasonable fee for even the briefest conference would surely exceed $10. Thus, the law that was enacted in 1864 to protect veterans from unscrupulous lawyers—those who charge excessive fees—effectively denies today's veteran access to *all* lawyers who charge reasonable fees for their services.[7]

## II

The Court's opinion blends its discussion of the paternalistic interest in protecting veterans from unscrupulous lawyers and the bureaucratic interest in minimizing the cost of administration in a way that implies that each interest reinforces the other. Actually the two interests are quite different and merit separate analysis.

In my opinion, the bureaucratic interest in minimizing the cost of administration is nothing but a red herring.[8] Congress has not prohibited lawyers from participating in the processing of claims for benefits and there is no reason why it

---

[7] In its Report on S. 349 in the 97th Congress, the Veterans' Administration stated:

"It is probably true that, except for those whose low income qualifies them for free legal services, the current fee limitation effectively precludes attorney representation before the VA." S. Rep. No. 97–466, p. 102 (1982) (letter of Veterans' Administration's Acting Director to Hon. Alan K. Simpson, dated July 14, 1981).

[8] Section 401 of a bill approved unanimously by the Senate Committee on Veterans' Affairs would have removed the $10-fee limitation for services rendered in representing a claimant following an initial decision of the Board of Veterans' Appeals. · The Committee Report stated: "Enactment of the provisions in Section 401 are estimated to entail no cost." *Id.*, at 79.

should.[9]   The complexity of the agency procedures can be regulated by limiting the number of hearings, the time for argument, the length of written submissions, and in other ways, but there is no reason to believe that the *agency's* cost of administration will be increased because a claimant is represented by counsel instead of appearing *pro se.*[10]   The informality that the Court emphasizes is desirable because it no doubt enables many veterans, or their lay representatives, to handle their claims without the assistance of counsel.   But there is no reason to assume that lawyers would add confusion rather than clarity to the proceedings.   As a profession, lawyers are skilled communicators dedicated to the service of their clients.   Only if it is assumed that the average lawyer is incompetent or unscrupulous can one rationally conclude that the efficiency of the agency's work would be undermined by allowing counsel to participate whenever a veteran is willing to pay for his services.   I categorically reject any such assumption.

The fact that a lawyer's services are unnecessary in most cases, and might even be counterproductive in a few, does not justify a total prohibition on their participation in all pension claim proceedings.   This fact is perhaps best illustrated by *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), a case in which we held that the State does not have a constitutional obliga-

---

[9] The Court's entire discussion of the bureaucratic interest is based on the assumption that the removal of the fee limitation constitutes a "proposed additional procedure."   See *ante,* at 327.   It would be more accurate to state that the proposal would permit more qualified spokesmen to participate in the existing procedure.

[10] The District Court unequivocally found that, apart from the paternalistic interest, the Government would not be harmed in the slightest by lifting the fee limitation.   The District Court wrote:

"The government has neither argued nor shown that lifting the fee limit would harm the government in any way, except as the paternalistic protector of claimants' supposed best interests."   589 F. Supp. 1302, 1323 (ND Cal. 1984).

See also n. 8, *supra.*

tion to provide a parolee or probationer with counsel in every revocation proceeding. The informality of the proceeding makes counsel unnecessary in most cases, but we squarely held that in some cases a lawyer's presence was constitutionally required.[11] Although, surprisingly, the Court relies on *Gagnon* today, see *ante*, at 324–325, not a word in that opinion implies that a parolee or probationer could be denied the right to have retained counsel represent him. The case-by-case approach to the participation of counsel endorsed in *Gagnon*[12] is the approach that should apply to veterans claim proceedings. Lawyers may not be needed in most cases, but should be permitted in appropriate cases.[13] The interest in efficient administration plainly does not justify a total prohibition on representation by counsel. Nor can it justify a rule that indirectly accomplishes that result by discouraging their participation in all cases.

---

[11] We stated:

"We thus find no justification for a new inflexible constitutional rule with respect to the requirement of counsel. We think, rather, that the decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system. Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees." 411 U. S., at 790.

[12] As we expressly noted:

"The need for counsel at revocation hearings derives, not from the invariable attributes of those hearings, but rather from the peculiarities of particular cases." *Id.*, at 789.

[13] In *FEC* v. *National Conservative PAC*, 470 U. S., at 493, the Court noted that "allowing the presentation of views while forbidding the expenditure of more than $1,000 to present them is much like allowing a speaker in a public hall to express his views while denying him the use of an amplifying system." By analogy, allowing the presentation of views by a *pro se* claimant while forbidding the expenditure of more than $10 to present them is much like allowing a speaker in a public hall to express his views while denying him the use of an amplifying system.

The paternalistic interest in protecting the veteran from his own improvidence would unquestionably justify a rule that simply prevented lawyers from overcharging their clients. Most appropriately, such a rule might require agency approval, or perhaps judicial review, of counsel fees. It might also establish a reasonable ceiling, subject to exceptions for especially complicated cases. In fact, I assume that the $10-fee limitation was justified by this interest when it was first enacted in 1864. But time has brought changes in the value of the dollar, in the character of the legal profession, in agency procedures, and in the ability of the veteran to proceed without the assistance of counsel.

In 1982, the Senate Committee on Veterans' Affairs reviewed the fee limitation and concluded:

"As was discussed in the VA's agency report on S. 330 (VA report on S. 330 at pages 16–17 (reprinted at pages 98–99 of S. Rept. No. 96–178)), the basis for Congressional action, first after the Civil War and then after World War I, limiting the amount an attorney could receive for representing a claimant before the VA was grounded in a belief that the lawyers of that day were unscrupulous and were taking unfair advantage of veterans by retaining an unwarranted portion of the veterans' statutory entitlement in return for very limited legal assistance. Whatever the merits of such a view at the time the limitation was imposed, and despite numerous court opinions upholding the validity of the statutory limitation in the face of challenges to its constitutionality (see, e. g., *Gendron* v. *Saxbe*, 389 F. Supp. 1303 (C. D. Cal.), *aff'd mem. sub nom, Gendron* v. *Levi*, 423 U. S. 802 (1975); *Staub* v. *Roudebush*, 574 F. 2d 637 (D. C. Cir. 1978)), *it is the Committee's position that such a view of today's organized bar, particularly in light of the widespread network of local bar associations that now generally police attorney behavior, is no longer tenable.*

"*The Committee is also of the view that the current statutory limitation is an undue hindrance on the rights*

*of veterans and other claimants to select representatives of their own choosing to represent them in VA matters.* As noted above, there is a strong and vital system of veterans service officers who provide excellent representation at no cost to claimants. The Committee fully expects and believes that this system will continue and prosper, undiminished by the new right of judicial review and opportunity for attorney participation created in this legislation. However, *an individual should not be arbitrarily restricted in retaining an attorney, whether such representation is desired for reasons of personal preference or because of a concern that the claim is likely to be denied a second time by the Board of Veterans' Appeals and will be appealed to court. A claimant could well conclude, for example, that some further development of the administrative record in a complex case would be of critical importance while the matter is still before the agency and that an attorney would be better able to so develop the record.*" S. Rep. No. 97–466, pp. 50–51 (1982) (emphasis added).

Moreover, the growth of the strong system of active service officers who provide excellent representation at no cost to claimants is significant because it has virtually eliminated the danger that a claimant will be tempted to waste money on unnecessary legal services. As the Senate Committee recognized, however, the availability of such competent, free representation is not a reason for denying a claimant the right to employ counsel of his own choice in an appropriate case.

## III

It is evident from what I have written that I regard the fee limitation as unwise and an insult to the legal profession. It does not follow, however, that it is unconstitutional. The Court correctly notes that the presumption of constitutionality that attaches to every Act of Congress requires the challenger to bear the burden of demonstrating its invalidity.

Before attempting to do so, I must comment on two aspects of the Court's rhetoric: Its references to the age of the statute and to the repudiation of *Lochner* v. *New York*, 198 U. S. 45 (1905).

The fact that the $10-fee limitation has been on the books since 1864 does not, in my opinion, add any force at all to the presumption of validity. Surely the age of the *de jure* segregation at issue in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), or the age of the gerrymandered voting districts at issue in *Baker* v. *Carr*, 369 U. S. 186 (1962), provided no legitimate support for those rules. In this case, the passage of time, instead of providing support for the fee limitation, has effectively eroded the one legitimate justification that formerly made the legislation rational. The age of the statute cuts against, not in favor of, its validity.

It is true that the statute that was incorrectly invalidated in *Lochner* provided protection for a group of workers, but that protection was a response to the assumed disparity in the bargaining power of employers and employees, and was justified by the interest in protecting the health and welfare of the protected group. It is rather misleading to imply that a rejection of the *Lochner* holding is an endorsement of rational paternalism as a legitimate legislative goal. See *ante*, at 323. But in any event, the kind of paternalism reflected in this statute as it operates today is irrational. It purports to protect the veteran who has little or no need for protection, and it actually denies him assistance in cases in which the help of his own lawyer may be of critical importance.[14]

---

[14] Justice Brandeis' statement in *Olmstead* v. *United States*, 277 U. S. 438 (1928), is worth remembering in this context:

"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Id.*, at 479 (Brandeis, J., dissenting).

But the statute is unconstitutional for a reason that is more fundamental than its apparent irrationality. What is at stake is the right of an individual to consult an attorney of his choice in connection with a controversy with the Government. In my opinion that right is firmly protected by the Due Process Clause of the Fifth Amendment[15] and by the First Amendment.[16]

The Court recognizes that the Veterans' Administration's procedures must provide claimants with due process of law, but then concludes that the constitutional requirement is satisfied because the appellees have not proved that the "probability of error under the present system" is unacceptable.[17] *Ante*, at 326. In short, if 80 or 90 percent of the cases are correctly decided, why worry about those individuals whose claims have been erroneously rejected and who might have prevailed if they had been represented by counsel?

The fundamental error in the Court's analysis is its assumption that the individual's right to employ counsel of his choice in a contest with his sovereign is a kind of second-class

---

[15] Cf. *Wright* v. *Ingold*, 445 F. 2d 109, 111–112 (CA7 1971).

[16] Some propositions are so obvious that they seldom need to be stated explicitly. In a series of cases the Court has considered the extent to which the First Amendment protects the lawyer's right to solicit business, finding protection in some situations but not others. Compare *In re Primus*, 436 U. S. 412, 423–426 (1978), with *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978). But in all of those cases it was necessarily assumed that the individual's right to ask for, and to receive, legal advice from the lawyer of his choice was fully protected by the First Amendment. That assumption was explicitly acknowledged by the parties in the *Primus* case and recognized in a footnote to our opinion, 436 U. S., at 426, n. 17 ("There is no doubt that such activity is protected by the First Amendment"). If ordinary communication between attorney and client is so protected, it is doubly important to prevent abridgment of communication in support of an exercise of the right to petition the Government for the redress of a veteran's grievances. See *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508, 510 (1972).

[17] Indeed, at one point in its opinion the Court seems to take the position that there is no constitutional defect unless "the entire system is operated contrary to its governing regulations." *Ante*, at 324, n. 11.

interest that can be assigned a material value and balanced on a utilitarian scale of costs and benefits.[18]   It is true that the veteran's right to benefits is a property right and that in fashioning the procedures for administering the benefit program, the Government may appropriately weigh the value of additional procedural safeguards against their pecuniary costs.   It may, for example, properly decide not to provide free counsel to claimants.   But we are not considering a procedural right that would involve any cost to the Govern-

---

[18] As I explained in protesting the Court's denigration of the right to counsel in proceedings to terminate parental rights:

"The issue is one of fundamental fairness, not of weighing the pecuniary costs against the societal benefits.   Accordingly, even if the costs to the State were not relatively insignificant but rather were just as great as the costs of providing prosecutors, judges, and defense counsel to ensure the fairness of criminal proceedings, I would reach the same result in this category of cases.   For the value of protecting our liberty from deprivation by the State without due process of law is priceless." *Lassiter* v. *Department of Social Services of Durham County*, 452 U. S. 18, 60 (1981) (dissenting).

Moreover, the Framers of the Constitution created a federal sovereign whose powers were to be exercised by different branches—a Legislature, an Executive, and a Judiciary—and which was expected to coexist with at least 13 other sovereigns having jurisdiction over the same people and the same territory.   Surely, if they were motivated by a desire to improve the efficiency of the economy, they could have developed a much more simple design for the new Government.   The reason they did not do so is perfectly clear.   The text of the Constitution is replete with provisions that are intended to secure the blessings of liberty—or conversely, to protect against the dangers of tyranny—notwithstanding their possible costs. Significantly, those protections not only recognized the evils associated with a monarch, or an executive with absolute power, but also the risk of tyranny by an unrestrained majority.   The limited delegations of power to the Federal Government, the tripartite division of authority among three branches of the Federal Government, the division of the Legislature into two Houses, the staggered terms of office, with Senators serving six years, the President four years, and Representatives only two, the provision for a Presidential veto of Acts of Congress, the guarantee of life tenure for federal judges—all of the checks and balances are consistent with the interest in protecting individual liberty from the possible misuse of power by a transient unrestrained majority.

ment.[19]  We are concerned with the individual's right to spend his own money to obtain the advice and assistance of independent counsel in advancing his claim against the Government.[20]

In all criminal proceedings, that right is expressly protected by the Sixth Amendment.  As I have indicated, in civil disputes with the Government I believe that right is also protected by the Due Process Clause of the Fifth Amendment and by the First Amendment.  If the Government, in the guise of a paternalistic interest in protecting the citizen from his own improvidence, can deny him access to independent counsel of his choice, it can change the character of our free society.[21]  Even though a dispute with the sovereign may only involve property rights, or as in this case a statu-

---

[19] The way the Court utilizes the *Mathews* v. *Eldridge* procedural-due-process analysis is somewhat misleading.  Here, appellees do not seek additional opportunities to be heard, to have counsel appointed at governmental expense, or any type of additional procedure.  They simply want to exercise their right to choose, to consult, and to employ the services of legal counsel in order to conduct and manage their personal affairs — a right that should be unfettered in a free society.

[20] See *Munn* v. *Illinois*, 94 U. S. 113 (1877):

"No State 'shall deprive any person of life, liberty, or property without due process of law,' says the Fourteenth Amendment to the Constitution. . . . By the term 'liberty,' as used in the provision, something more is meant than the mere freedom from physical restraint or the bounds of a prison. It means freedom to go where one may choose, and to act in such manner, not inconsistent with the equal rights of others, as his judgment may dictate for the promotion of his happiness; that is, to pursue such callings and avocations as may be most suitable to develop his capacities, and give to them their highest enjoyment." *Id.*, at 142 (Field, J., dissenting).

[21] As Justice Jackson recognized in *American Communications Assn.* v. *Douds*, 339 U. S. 382, 442–443 (1950):

"The priceless heritage of our society is the unrestricted constitutional right of each member to think as he will.  Thought control is a copyright of totalitarianism, and we have no claim to it.  It is not the function of our Government to keep the citizen from falling into error; it is the function of the citizen to keep the Government from falling into error."

tory entitlement, the citizen's right of access to the independent, private bar is itself an aspect of liberty that is of critical importance in our democracy.[22]   Just as I disagree with the present Court's crabbed view of the concept of "liberty,"[23] so do I reject its apparent unawareness of the function of the independent lawyer as a guardian of our freedom.[24]

In my view, regardless of the nature of the dispute between the sovereign and the citizen—whether it be a criminal trial, a proceeding to terminate parental rights, a claim for social security benefits, a dispute over welfare benefits, or a pension claim asserted by the widow of a soldier who was killed on the battlefield—the citizen's right to consult an independent lawyer and to retain that lawyer to speak on his or her behalf is an aspect of liberty that is priceless.   It

[22] The Solicitor General cavalierly states that "[n]othing in the First Amendment suggests that the fee limitation is unconstitutional because it restricts a claimant in hiring a private lawyer where other, adequate representation is available without charge."   Brief for Appellants 47.   This statement misses a principle so plain and fundamental that I would think it would not need to be stated: Every citizen in this country is presumed to be unrestricted in consulting or employing an attorney on any matter, or in making the decision that legal representation for any purpose is not needed.   As to this proposition, it makes no difference whether, as the Solicitor General claims, "the existing VA claims procedure is fair and adequate without privately retained attorneys," *ibid.*, a conclusion that the District Court rejected.   The statute, moreover, on the one hand, recognizes and allows legal representation, but on the other hand restricts the veteran's right to choose and to consult a legal representative in any meaningful manner, thus virtually reducing the right to counsel to nonexistence.

[23] Compare *Meachum* v. *Fano*, 427 U. S. 215, 225–226 (1976), with *id.*, at 230 (STEVENS, J., dissenting).

[24] That function was, however, well understood by Jack Cade and his followers, characters who are often forgotten and whose most famous line is often misunderstood.   Dick's statement ("The first thing we do, let's kill all the lawyers") was spoken by a rebel, not a friend of liberty.   See W. Shakespeare, King Henry VI, pt. II, Act IV, scene 2, line 72.   As a careful reading of that text will reveal, Shakespeare insightfully realized that disposing of lawyers is a step in the direction of a totalitarian form of government.

should not be bargained away on the notion that a totalitarian appraisal of the mass of claims processed by the Veterans' Administration does not identify an especially high probability of error.[25]

Unfortunately, the reason for the Court's mistake today is all too obvious. It does not appreciate the value of individual liberty.

I respectfully dissent.

---

[25] According to the Court, "process which is sufficient for the large majority of a group of claims is by constitutional definition sufficient for all of them." *Ante*, at 330.