Kirsten ERICSON, Dacia Kornechuk, Dr. Paul Ericson, Linda Ericson, Edwina Kornechuk, and John Kornechuk, Plaintiffs,

v.

SYRACUSE UNIVERSITY, Kenneth Shaw, Jesse Dwire, Jake Crouthamel, Robert Gifford, Janet Kittel, Neil B. Strodel, Eleanor Gallagher, Louis Marcoccia, Robert S Pickett, Colleen O. Bench, Nancy R. Mudrick, and Louis R. Walker, Jr., Defendants.

No. 98 Civ. 3435 (JSR).

United States District Court, S.D. New York.

April 13, 1999.

 

Alan C. Trachtman, William J. Dealy, Dealy & Trachtman, New York City, for Plaintiffs.

James E. McGrath, III, Daniel Murphy, Jr., Mary Ellen Donnelly, Putney, Twombley, Hall & Hirson, New York City, for Defendant Jesse Dwire.

Sheila Gowan, Asst. U.S. Atty., U.S. Atty's Office, New York City, for U.S.

## OPINION

RAKOFF, District Judge.

On March 25, 1999, this Court, ruling from the bench, upheld the constitutionality of Subtitle C of the Violence Against Women Act, 42 U.S.C. § 13981, which entitles any person injured by a gender-motivated crime of violence to sue the perpetrator in federal court. Very shortly thereafter, the instant case settled. Nonetheless, because this Court's decision was apparently the first to address the question of the constitutionality of section 13981 since the Fourth Circuit held that section unconstitutional in *Brzonkala v. Virginia Polytechnic Institute and State University*, 169 F.3d 820 (4th Cir.1999) (*en banc*), it may be useful to summarize in writing the reasons for this Court's conclusion.

In enacting the Violence Against Women Act in September 1994, Congress was concerned that gender-based acts of violence were sufficiently widespread and unchecked as to significantly and negatively affect commerce among the states. Since women—the usual victims of gender-motivated violence—are increasingly involved in every aspect of commercial activity, violence that removes them from the workplace, denies their right to travel, and reduces their productivity has an immediate and substantial impact on the national economy. If the states, in the exercise of their general police power, fail adequately to deter such a burden on interstate commerce, it is necessary and proper that the federal government do so. U.S. Const. art I, § 8, cl. 18.

Congress' concerns followed upon four years of hearings that determined that:

— Gender-motivated violence against women is rampant throughout the United States. *See, e.g.*, S.Rep. No. 103–138, at 38 (1993) ("Violence is the leading cause of injuries to women ages 15 to 44, more common than automobile accidents, muggings, and cancer deaths combined. As many as 4 million women a year are the victims of domestic violence. Three out of four women will be the victim of a violent crime sometime during their life."); H.R.Rep. No. 103–395, at 26 (1993) ("Since 1988, the rate of incidence of rape has risen four and a half times as fast as the total crime rate.")

— Such violence substantially impacts the ability of women to function in inter-

state commercial activities. *See, e.g.,* S.Rep. No. 103–138 at 41 ("Gender-based violence bars its most likely targets—women—from full [participation] in the national economy). For example, studies report that almost 50 percent of rape victims lose their jobs or are forced to .quit in the aftermath of the crime."; *id.* at 54 n. 70 ("[W]omen often refuse higher paying night jobs in service/retail industries because of the fear of attack."); H.R. Conf. Rep. No. 103–711, at 385 (1994) ("crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce").

—— The states have been unable or, in some cases, unwilling to address gender-based violence with the same assiduousness with which they address other forms of violence. *See, e.g.,* S.Rep. No. 102–197 at 43 (1991) ("Study after study commissioned by the highest courts of the States—from Florida to New York, California to New Jersey, Nevada to Minnesota—has concluded that crimes disproportionately affecting women are often treated less seriously than comparable crimes against men.").[1]

Finding that a wealth of facts supported these conclusions, Congress enacted the Violence Against Women Act, in order, among other goals, to implement Congress' plenary power to "regulate commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. *See generally North Am. Co. v. Securities and Exchange Commission,* 327 U.S. 686, 705, 66 S.Ct. 785, 90 L.Ed. 945 (1946). As one part of that Act, Congress, in section 13981, provided victims of gender-motivated violence with a private federal remedy, both so that they might obtain the redress not afforded them by the states and so that, in the process, they might also effectively serve as "private attorney generals," helping to combat this clog on commerce.

 A federal court should pause long and hard before declaring unconstitutional a statutory provision that is the product of such lengthy inquiry and detailed findings by a Congress itself consisting of the democratically-elected representatives of the several states. *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 319, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). Indeed, it is axiomatic that in the case of legislation designed to implement a specified federal power, federal courts will ordi-

1. Citing: Administrative Office of the California Courts, Judicial Council, *Achieving Equal Justice for Women and Men in the Courts* 65 (1990) (established by Chief Justice of California Supreme Court); Colorado Supreme Court Task Force on Gender Bias in the Courts, *Gender & Justice in the Colorado Courts* (1990); Connecticut Task Force, *Gender, Justice and the Courts* (1991) (established by Chief Justice of Connecticut Supreme Court (1991)); Florida Supreme Court Gender Bias Study Commission, *Report* (1990); Supreme Court of Georgia, *Gender and Justice in the Courts* (1991); Illinois Task Force, *Gender Bias in the Courts* (1990) (established by three bar associations at the direction of the Chief Justice of the Illinois Supreme Court); Maryland Special Joint Committee, *Gender Bias in the Courts* (1989) (established by Chief Justice of Maryland Supreme Court); Massachusetts Supreme Judicial Court, *Gender Bias Study of the Court System in Massachusetts* (1989); Michigan Supreme Court Task Force on Gender Issues in the Courts, *Final Report* (1989); Minnesota Supreme Court Task Force for Gender Fairness in the Courts, *Final Report,* reprinted in 15 Wm. Mitchell L.Rev. No. 4 (1989); Nevada Supreme Court Gender Bias Task Force, *Justice for Women;* New Jersey Supreme Court Task Force, *Women in the Courts* (1984); New York Task Force on Women in the Courts, *Report,* reprinted in 15 Fordham Urban Law Journal No. 1 (1986); Rhode Island Supreme Court Committee on Women in the Courts (1987); Utah Task Force on Gender and Justice, *Report to the Utah Judicial Council* (1990); Vermont Supreme Court and Vermont Bar Association, *Gender and Justice; Report of the Vermont Task Force on Gender Bias in the Legal System* (1991); Washington State Task Force, *Gender and Justice in the Courts* (1989) (established by Chief Justice of Washington Supreme Court); Wisconsin Equal Justice Task Force, *Final Report* (1991) (established by Chief Justice of Wisconsin Supreme Court).

narily uphold the constitutionality of a statute that has any rational relationship to effectuating that power. *Hodel v. Virginia Surface Min. and Reclamation Ass'n. Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). The deferential nature of this review accords not only with the role assigned to the judiciary under the Constitution, *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), but also with the "properly limited [ ] role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Notwithstanding such deference, there are statutes whose facial irrelevance to any federal power, coupled with an absence of any Congressional finding offering some reasoned connection to any federal power, leaves a court with no rational basis upon which to premise constitutionality. With respect to the Commerce Clause, such a statute was the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), held unconstitutional in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). It neither dealt with commerce on its face nor was the subject of any Congressional findings supporting a rational connection to the regulation of interstate commerce. To uphold its constitutionality the Supreme Court would have had "to pile inference upon inference" in a manner more tantamount to speculation than ratiocination. *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624.

*Brzonkala*, however, goes further and interprets *Lopez* as requiring that the subject matter of a statute must itself be economic activity in order to make out the necessary connection to the Commerce Clause. *Brzonkala*, 169 F.3d 820, 830, 832. Such a reading construes *Lopez* as greatly narrowing, if not silently overruling, a host of past precedents, *see, e.g.*, *Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) ("[T]he power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce."); *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce."); *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36–37, 57 S.Ct. 615, 81 L.Ed. 893 (1937) ("The fundamental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement.'") (internal citation omitted); *Gibbons v. Ogden*, 9 Wheat. 1, 22 U.S. 1, 196, 6 L.Ed. 23 (1824) (Congress' commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."). Functionally, moreover, the *Brzonkala* court's view of the Commerce Clause considerably limits the ability of Congress to address the complex interaction of social and economic forces typical of the modern state.

As a result, the Fourth Circuit's restrictive interpretation of *Lopez* and the Commerce Clause has not commended itself to other courts. As the Second Circuit Court of Appeals, interpreting *Lopez*, stated only last year: "Congress may regulate to prevent the inhibition or diminution of interstate commerce . . . even when the activity controlled is not itself commercial." *United States v. Weslin*, 156 F.3d 292, 296 (2d Cir.1998). *Accord U.S. v. Bird*, 124 F.3d 667, 676 (5th Cir.1997) ("After *Wickard*—and its reaffirmance in *Lopez*—there can be no question that Congress is able to regulate noncommercial, intrastate activity that substantially affects interstate commerce.").

The *Brzonkala* court's mincing view of the Commerce Clause appears to rest on a misapprehension of the concerns that led the Supreme Court in *Lopez* to warn that

premising federal legislation on attenuated relationships to interstate commerce would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624. Section 13981 warrants no such fears. Unlike the mere threat of violence involved in the Gun–Free School Zones Act overturned in *Lopez*, section 13981 deals with actual acts of gender-based violence, whose impact on interstate commerce, though indirect, is far from remote or speculative. Moreover, it is a form of violence that the states have chosen not to address adequately. Where the states fail to exercise their police power to combat a form of antisocial activity—violence against women—that also negatively impacts interstate commerce, the federal government need not likewise default but may instead seek to remedy these indirect but substantial injuries to the functioning of the national economy.

Section 13981 is expressly premised on Congress' findings that the states have failed to afford adequate remedies to victims of gender-motivated violence, even to the point of failing to prosecute numerous instances of domestic violence that would have been prosecuted if they had occurred among men on the street. *See, e.g.,* Illinois Task Force, *Gender Bias in the Courts* 16 (1990); Texas Gender Bias Task Force, *Final Report* 5 (1994). Nothing in section 13981, however, displaces any state law or official action, nor prevents the states from exercising their police power to the fullest to combat gender-based violence. All that section 13981 does is provide victims of such violence a remedy that, as a practical matter, they often lack under state practice. If that remedy proves to be concurrent with other remedies made available under state law, the states' police power will simply be augmented, not supplanted.

This is not a situation in which any state has an affirmative and express policy of denying relief to victims of gender-based violence, so that the federal legislation is in conflict with the state's exercise of its police power or intrudes upon state policy. On the contrary, the definition of acts of violence under section 13981 is expressly grounded in state (as well as federal) criminal law. 42 U.S.C. § 13981(d)(2). But having for so long failed to enforce such statutes when gender-based violence is involved, the states have left Congress with little alternative but to provide an additional remedy so that the deleterious impact of such violence on commerce among the states does not go unredressed or undeterred.

Accordingly, this Court hereby reconfirms its conclusion of March 25, 1999 that section 13981 of the Violence Against Women Act is a lawful exercise of Congress' power under the Commerce Clause.[2]

2. Because of this conclusion, the Court has no occasion to consider whether or not section 13981 is also a lawful exercise of Congress' power under the Fourteenth Amendment.